42 A.3d 1

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## Constance A. CAMUS.

Misc. Docket AG No. 15, Sept. Term, 2011.

Court of Appeals of Maryland.

April 23, 2012.

418

Marianne J. Lee, Assistant Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for Petitioner.

Melvin G. Bergman, Esquire, Greenbelt, MD, for Respondent.

Argued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

McDONALD, J.

The Attorney Grievance Commission (the "Commission") charged Constance A. Camus with violating numerous provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"). The alleged violations all arose during Ms.

Camus' representation of two clients in domestic relations matters. Pursuant to Maryland Rules 16–752(a) and 16–757, we referred the matter to Judge Pamela L. North of the Circuit Court for Anne Arundel County to conduct a hearing and to provide findings of fact and recommended conclusions of law.

After a two-day hearing, Judge North concluded that Ms. Camus had committed all but one of the types of violations charged by the Commission, including violations of MLRPC 1.1 (duty to provide competent representation); 1.2(a) (duty to abide by client decisions regarding objectives of representation); 1.3 (duty to act with reasonable diligence and promptness); 1.4(a),(b) (duty to inform and consult with client); 1.5(a),(d) (prohibition against unreasonable fees); 1.15(a),(d) (duty to keep safe funds of client or third parties); 1.16(d) (duty to protect client interests after termination of representation); 3.4(c) (duty to obey an obligation under rules of a tribunal); 8.1(b) (duty to respond to lawful demand from disciplinary authority); 8.4(b) (prohibition against commission of a criminal act that reflects adversely on fitness); 8.4(c) (prohibition against conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (prohibition against conduct prejudicial to the administration of justice).[1]

Although Ms. Camus did not dispute the findings of fact, she filed exceptions to Judge North's conclusions of law. This Court held a hearing to consider those exceptions and the appropriate sanction. For the reasons stated below, we conclude that Ms. Camus committed the violations found by Judge North and that she must be disbarred.

## Background

Ms. Camus was admitted to the Maryland Bar in 1997. During the period relevant to this proceeding, she operated a solo practice focused on family law in Edgewater, Maryland.

---

1. The Commission also had alleged a violation of MLRPC 1.6(a) (duty to maintain confidentiality of information related to representation), but withdrew the charge at the hearing.

By her own testimony, she had a caseload of six to eight clients at that time. The alleged violations arose out of her representation of two of those clients.[2]

*The Martin Complaint*

After obtaining a protective order against her son's father, Robin D. Martin needed legal representation for a hearing in that case in the Circuit Court for Anne Arundel County. A mutual friend introduced her to Ms. Camus, who agreed to represent her at the hearing for a $2,000 fee, which was paid by the friend. At the hearing on July 13, 2009, Ms. Camus entered her appearance and negotiated a consent order.

After the proceeding, Ms. Camus and Ms. Martin discussed Ms. Martin's pending custody action in the circuit court. Ms. Camus agreed to represent her in the custody action if Ms. Martin, who owned a cleaning service, would come to Ms. Camus' home once a week to clean and do other chores. This arrangement was not put in writing. From August 2009 until early January 2010, Ms. Martin went to Ms. Camus' home on most Fridays to clean and do chores.

As the custody case proceeded, Ms. Martin continued to receive mailings directly from the court because Ms. Camus had not entered her appearance in the case, despite Ms. Martin's repeated requests that she do so. Because there was no attorney of record in the case, opposing counsel also sent notices and discovery requests directly to Ms. Martin. At an October 28, 2009, scheduling conference with the domestic relations master at which Ms. Camus appeared, she was given the opportunity to enter her appearance, but did not do so. The master recommended that Ms. Camus be directed to enter her appearance within 10 days, and the circuit court issued an order to that effect on November 2, 2009. Nevertheless, Ms. Camus never entered her appearance in the case. Judge North found that Ms. Camus' testimony that she simply

---

**2.** These facts are derived from Judge North's findings and the stipulated facts and documents submitted by the parties. No exceptions to the findings of fact have been filed, and we accept them as established for purposes of this proceeding. *See* Maryland Rule 16–759(b)(2).

forgot to enter her appearance was not credible, in light of the various requests by her client, her representations to opposing counsel, and the court order.

There were other instances of neglect. For example, although Ms. Camus discussed responses to discovery requests with both Ms. Martin and opposing counsel, she never completed or filed responses and never submitted discovery requests to the opposing party. When Ms. Martin told Ms. Camus that her son's father had violated the protective order, Ms. Camus took no action.[3] According to Ms. Martin, when she asked questions about the status of her case, Ms. Camus became angry and threatened to terminate the representation.

When Ms. Camus did not attend a December 22, 2009, hearing concerning a violation of the consent order, Ms. Martin found another attorney to represent her. The substitute attorney called Ms. Camus to request the case file. Ms. Camus said the file could be picked up from her home, but did not have it ready when Ms. Martin attempted to retrieve it. In January 2010, Ms. Camus told Ms. Martin's mother that she was mailing the file to the new attorney, but never did so. Ms. Camus eventually provided Ms. Martin with a few documents, including business cards of police officers, discovery requests, a litigation timeline, and a witness list.

On February 2, 2010, Ms. Martin filed a complaint against Ms. Camus with the Commission. After two requests by Bar Counsel, Ms. Camus eventually provided a belated written response to the complaint.

*The Eyles Complaint*

In June 2009, Donna Smith Eyles was in negotiations to settle her contested divorce. Dissatisfied with a proposed settlement recommended by her lawyer at the time, Ms. Eyles searched online for a new attorney and found Ms. Camus. After some preliminary research, Ms. Camus agreed that Ms.

---

**3.** According to Ms. Camus, she viewed any further involvement in the protective order case following the consent order as a "pro bono" matter.

Eyles should not take the settlement and should, instead, challenge the enforceability of a prenuptial agreement. Ms. Eyles signed a retainer agreement on June 20, 2009, which set a rate of $250 per hour for Ms. Camus' services, and paid a $3,000 retainer. Shortly thereafter, Ms. Camus entered her appearance on behalf of Ms. Eyles and the divorce trial was scheduled for September 11, 2009.

In July 2009, Ms. Camus told Ms. Eyles that she had spent considerable time researching the enforceability of the prenuptial agreement and would require an additional $5,000 payment. Ms. Eyles sent the payment on July 23 and requested a billing statement. Ms. Camus did not respond to that request.

In August 2009, Ms. Eyles, who had recently moved to Texas, contacted Ms. Camus for advice about a joint bank account that she had with her estranged husband. Ms. Camus advised Ms. Eyles to take the money out of the account and transfer it into Ms. Camus' trust account for safekeeping. On August 12, Ms. Eyles transferred $11,900 from the joint account to Ms. Camus' trust account. Ms. Eyles did not believe that the money would be used for legal fees.

Around this time, Ms. Camus filed a motion to bifurcate the proceedings on the prenuptial agreement and the divorce. The circuit court granted the motion and scheduled a hearing on the enforceability of the prenuptial agreement for November 3, 2009, and the merits hearing for the divorce for January 28, 2010.

On October 28, 2009, Ms. Camus—without informing Ms. Eyles—filed a motion to continue the hearing on the prenuptial agreement and it was rescheduled for January 28, 2010. Although Ms. Eyles told Ms. Camus that she wished to proceed without further delay, Ms. Camus attempted in early 2010 to have the court further postpone the hearing. Those requests were denied.

In preparation for the hearings, Ms. Camus encouraged Ms. Eyles to hire a forensic psychologist to testify as to Ms. Eyles' state of mind at the time she signed the prenuptial agree-

ment.[4]   Ms. Camus also thought it necessary to hire a forensic accountant to testify about the couple's financial assets and how they should be divided.[5]   On January 22, 2010, Ms. Eyles called Ms. Camus to ask if she could pay the accountant's fee from the funds in the trust account.   She was told then for the first time that Ms. Camus had taken those funds for legal fees. Although this use of the funds was contrary to Ms. Eyles' understanding, she did not challenge her lawyer, but made other arrangements to pay the accountant and shortly thereafter informed Ms. Camus that the accountant would be ready for the January 28 hearing on the prenuptial agreement.

At that hearing, opposing counsel requested a continuance because of a family illness.   The request was granted and the hearing was postponed until February 5.   On February 2, against Ms. Eyles' wishes, Ms. Camus asked the court to reconsider its denial of her earlier request for a continuance. Although the forensic accountant was ready for the hearing, Ms. Camus told the court that the continuance was necessary because he was not prepared.   The motion was granted and the hearing was rescheduled for April 6, 2010.

According to Ms. Eyles, Ms. Camus was frequently late for court appearances.   For example, on April 5, 2010, Ms. Camus was 40 minutes late to a hearing on a motion to compel.   That hearing was most notable not for its delayed start, but for its bizarre conclusion, which prompted Ms. Eyles to seek a new lawyer.   At the close of the proceeding, Ms. Camus was arrested by deputy sheriffs for reasons unrelated to the divorce action.[6]   As Ms. Camus was removed from the courtroom, Ms. Eyles retrieved Ms. Camus' trial binder.   She

---

4.   Ms. Eyles ultimately paid $15,000 herself for the services of the forensic psychologist.

5.   Ms. Eyles first hired Dr. Tom Morin, who unexpectedly died on December 30, 2009.   Ms. Camus then referred Ms. Eyles to a second forensic accountant, Dr. Joel Morse.

6.   Ms. Camus' arrest was purportedly based on a bench warrant.   No outstanding bench warrant was found, however, and Ms. Camus was released later that day.   The record casts no further light on this event.

discovered that the binder contained only 25 pages of materials and did not include the pleadings discussed at the hearing or any other documents related to the motion at issue. This confirmed her belief that her lawyer had not been prepared to handle her case.[7] That night, Ms. Eyles called Ms. Camus to terminate the representation. The next day, the court rescheduled the hearing on the prenuptial agreement and the divorce trial for July and October 2010, respectively.

Ms. Eyles soon retained new counsel. The successor counsel called Ms. Camus and asked for Ms. Eyles' files, which Ms. Camus agreed to send by May 3. The files, however, were never received. On May 7, Ms. Eyles wrote Ms. Camus and requested that her files be sent to the new attorney. In an e-mail reply, Ms. Camus stated that the files would not be released until Ms. Eyles paid her outstanding legal bills. As of that time, however, Ms. Camus had not provided Ms. Eyles with a billing statement of any kind.

Two days after Ms. Eyles had retained a new lawyer, Ms. Eyles filed a complaint with the Commission against Ms. Camus. Bar Counsel wrote Ms. Camus on May 25, requesting a response to the complaint. Before submitting her response, however, Ms. Camus, on June 13, sent Ms. Eyles a "final legal bill" totaling $100,096.48. The bill indicated that $19,900 had already been paid. The credited amounts included the initial $3,000 retainer fee, the $5,000 additional payment, and the $11,900 that Ms. Camus had taken from the trust account—resulting in a "balance owed" of $80,106.48.

Ms. Camus had not sent periodic billing statements and, indeed, had not previously provided Ms. Eyles with any billing statements despite her requests. Ms. Eyles was shocked by the size of the bill and believed it had been sent in retaliation for her complaint to the Commission. In her testimony before Judge North, Ms. Camus conceded that she had not created the bill contemporaneously with the representation, but

---

7. An attorney later retained by Ms. Eyles testified that the binder primarily contained articles about prenuptial agreements.

claimed that she had maintained time sheets and other records to support the charges. No exhibits were submitted to document those assertions.

Two days after sending the bill to Ms. Eyles, Ms. Camus told Bar Counsel that she needed additional time to respond to Ms. Eyles' complaint because her dog had died. Bar Counsel extended the deadline to June 23, 2010. On that day, Ms. Camus again asked Bar Counsel for additional time, stating that her computer had been damaged in a storm. The response was ultimately filed on June 25.

Seeking satisfaction of the $80,106.48 balance on her legal bill, Ms. Camus continued to resist efforts by Ms. Eyles and her new attorney to obtain the client file. On June 28, 2010, Ms. Camus wrote Ms. Eyles and asked if she still needed documents from her file. Ms. Eyles' new counsel replied the same day, again requesting the file in its entirety and instructing Ms. Camus not to contact Ms. Eyles directly. Ms. Camus later testified that she had been willing to allow the new counsel to copy some documents in the file, but had not been willing to give her the entire file.

Ms. Eyles' new counsel was eventually able to obtain copies of the pleadings from opposing counsel. The successor attorney, who had significant experience over the span of two decades in family law matters involving military families,[8] determined that the prenuptial agreement was enforceable and did not understand why a forensic psychologist had been hired. On July 2, 2010, the parties reached a settlement that was less than the offer obtained by the counsel who had preceded Ms. Camus.[9] The expert opinions obtained by Ms. Camus were deemed unhelpful and were not used in the negotiation of the settlement.

---

8. Military pensions were at the heart of the property dispute in Ms. Eyles' case.

9. The opposing party was apparently unwilling to match the earlier amount because of the substantial delays and expenses that had occurred in the interim.

On July 20, 2010, Ms. Camus filed a Motion to Enforce Attorney's Lien against the funds due Ms. Eyles from the settlement. Some months later, the circuit court denied that motion, ruling that the lien was unenforceable because Ms. Camus' work did not aid the ultimate outcome of the case.

Meanwhile, Bar Counsel continued to seek information from Ms. Camus about Ms. Eyles' complaint to the Commission. On July 14, 2010, Bar Counsel sent Ms. Camus a letter inquiring as to the fees charged, her billing practices, and the management of Ms. Eyles' payments. A written response, with copies of supporting documents, was due within 10 days. Ms. Camus submitted her response on November 1, 2011, more than 15 months after it was requested and just two days prior to the hearing before Judge North on the complaints against her.

*The Hearing Judge's Conclusions of Law*

In a detailed analysis based on these facts, Judge North concluded that Ms. Camus had violated multiple rules of professional conduct. With respect to both clients, Judge North concluded that Ms. Camus had violated MLRPC 1.3 (duty to act with reasonable diligence and promptness), 1.4(a) (duty to inform and consult with the client), 1.4(b) (duty to enable the client to make informed decisions), 1.16(d) (duty to protect client interests after termination), and 8.4(d) (prohibition against conduct prejudicial to the administration of justice).

With respect to Ms. Martin alone, Judge North also concluded that Ms. Camus had violated MLRPC 1.2(a) (duty to abide by client decisions regarding objectives of representation) and 3.4(c) (duty to obey an obligation under the rules of a tribunal). With respect to Ms. Eyles alone, Judge North concluded that Ms. Camus had violated MLRPC 1.1 (duty to provide competent representation), 1.5(a) (prohibition on unreasonable fees), 1. 15(a) (duty to keep safe funds of client or third parties), 1.15(d) (duty to notify concerning funds or property received), 8.1(b) (duty to respond to lawful demands for information from a disciplinary authority), 8.4(b) (prohibi-

tion against commission of a criminal act that reflects adversely on fitness), and 8.4(c) (prohibition against conduct involving dishonesty, fraud, deceit, or misrepresentation).[10]

*Exceptions*

Ms. Camus did not except to Judge North's findings of fact. She did take issue with some inferences and conclusions of law made by Judge North, largely with respect to the Eyles complaint.

## Discussion

We review the hearing judge's conclusions of law *de novo* pursuant to Rule 16–759(b)(1), in light of the exceptions filed by Ms. Camus.

*Violations Related to Representation of Robin Martin*

■ We agree that Ms. Camus committed the violations cited by Judge North related to her representation of Robin Martin. Many of these violations stem from Ms. Camus' failure to enter an appearance in the case after she was asked to do so by her client and after she was directed to do so by the court. For example, the failure to enter an appearance, together with her failure to carry out her undertakings with respect to discovery, was "prejudicial to the administration of justice" in violation of MLRPC 8.4(d), as it caused considerable confusion for opposing counsel, who was unable to rely on any of Ms. Camus' actions or statements in the case because she was not the attorney of record.

Those failings also violated MLRPC 1.3 (lawyer to act with "reasonable diligence and promptness in representing a client") and MLRPC 3.4(c) ("A lawyer shall not ... (c) knowingly disobey an obligation under the rules of a tribunal ..."). The failure to enter an appearance caused both opposing counsel and the circuit court to send notices and other filings

---

10.  Judge North ruled that, although Ms. Camus violated MLRPC 1.2(a) (duty to abide by client decisions regarding objectives of representation) with respect to Ms. Martin, she did not violate that rule with respect to Ms. Eyles.

directly to Ms. Martin. With this correspondence entirely bypassing Ms. Camus, she could hardly fulfill the obligations of MLRPC 1.4(a)(2), which required her to "keep the client reasonably informed about the status" of her case.

Under MLRPC 1.2(a), it is professional misconduct to disregard a client's decisions about the objectives of the representation. Ms. Camus failed to further any of Ms. Martin's objectives, much less the simple objective that she take charge of the litigation. In her exceptions, Ms. Camus argues that Ms. Martin had an unattainable agenda, and contends that legitimate disagreements about her client's goals cannot be grounds for a violation of MLRPC 1.2(a). Whether Ms. Camus and Ms. Martin had a shared understanding of the aims of the representation, it was impossible for Ms. Camus to accommodate Ms. Martin's wishes in the case because Ms. Camus never entered her appearance. Moreover, by responding to Ms. Martin's questions with threats to terminate the representation, Ms. Camus violated both MLRPC 1.4(a)(2) and (3), under which an attorney must "promptly comply with reasonable requests for information." By not explaining to Ms. Martin the need for timely completion of opposing counsel's discovery requests, Ms. Camus failed to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," a violation of MLRPC 1.4(b).

Ms. Camus' mismanagement of the representation did not end when Ms. Martin retained new counsel. MLRPC 1.16(d) directs that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... surrendering papers and property to which the client is entitled[.]" After obtaining another attorney, Ms. Martin made multiple attempts to retrieve her file from Ms. Camus, but the file was never prepared for her. Although Ms. Camus eventually provided her with a few items related to her case, Ms. Martin's interests were not served by the provision of these limited documents or the delays in transmitting them.

*Violations Related to Representation of Donna Eyles*

We also agree that Ms. Camus committed the violations found by Judge North with respect to her representation of Donna Eyles.

■ MLRPC 1.1 codifies the lawyer's duty to provide competent representation. In her exceptions, Ms. Camus argues that, contrary to the view of Judge North and the two other attorneys who represented Ms. Eyles, her decision to pursue a challenge to the prenuptial agreement was a justifiable approach to the divorce case. Ms. Camus characterizes it as a matter of professional judgment made in good faith, and argues that such a judgment should not later, with the benefit of hindsight, be scrutinized as a question of competence. In deciding whether she satisfied her duty to provide competent representation, however, we do not consider her litigation strategy in a vacuum. Viewed as a whole, Ms. Camus' representation of Ms. Eyles fell below the standard of a competent practitioner.

The record demonstrates a general mishandling of Ms. Eyles' case. Ms. Camus was unready for multiple proceedings and forced to seek postponements[11]; when the proceedings were held, she was often late and inadequately prepared.[12] Apart from scheduling and discovery, the only significant motion that she litigated in the case was a motion to enforce an attorney's lien on the divorce settle-

---

11. Her pursuit of numerous continuances contrary to her client's wishes also violated MLRPC 1.3, which requires the lawyer to act with "reasonable diligence and promptness when representing a client." In her exceptions, Ms. Camus disputes this conclusion, arguing that Ms. Eyles was not prejudiced by the continuances. Delays in litigation are not without impact on the client, as the commentary to the rule recognizes. *See* MLRPC 1.3, comment 3. In this case, for instance, Ms. Eyles was living in Texas, and the frequent continuances required her to travel repeatedly to Maryland at significant cost and inconvenience. Moreover, the delays resulted in steadily accumulating legal fees and expenses.

12. For example, Ms. Camus' trial binder for one hearing mainly contained articles about an unrelated issue, and lacked copies of the pleadings being considered at the hearing.

ment—a motion that the circuit court denied on the ground that her participation in the case had not contributed to the amount of the settlement.

The representation was also marked by a failure to communicate with her client. For example, Ms. Camus failed to inform Ms. Eyles of court dates, and did not explain to her that documents given to the forensic psychologist would be discoverable by opposing counsel. Ms. Camus did not send Ms. Eyles a billing statement when she requested one; the only bill that she did send came on the heels of Ms. Eyles' complaint to the Commission. In her exceptions, Ms. Camus asserts that there was a reasonable (if imperfect) level of communication between her and her client, and describes the lack of billing information as a minor oversight. But the omissions found by Judge North in Ms. Camus' communications with her client demonstrate that Ms. Camus did not keep Ms. Eyles "reasonably informed" about the status of her case or "promptly comply with reasonable requests for information," as required by MLRPC 1.4(a). By not making the discovery procedures clear, Ms. Camus also failed to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," as required by MLRPC 1.4(b).

Judge North concluded that the bill for $100,096.48 that Ms. Camus sent Ms. Eyles in the wake of the client's complaint to the Commission violated MLRPC 1.5(a), which prohibits the charging of "an unreasonable fee or an unreasonable amount for expenses." Taking exception to this conclusion, Ms. Camus argues that the Commission did not prove the fee to be unreasonable, while she herself provided slim support for the fee with respect to any of the eight factors listed in MLRPC 1.5(a). The available evidence demonstrates that the fee was unreasonable. Among the factors that may be considered under MLRPC 1.5(a) are "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." Much of the fee was attributed to Ms. Camus' decision to

attack the prenuptial agreement. Judge North found that the amount of time that Ms. Camus claimed to have spent researching the enforceability of the prenuptial agreement was unnecessary given that she claimed family law as her primary area of practice, that disputes about prenuptial agreements are primarily questions of contract, and that this agreement was not particularly complex or novel.[13] Billing for unnecessary work is unreasonable.

MLRPC 1.5(a) also suggests consideration of "the amount involved and the results obtained"—a factor that does not inure in favor of this bill, as the only results obtained by Ms. Camus were numerous continuances of the proceedings. The remaining factors of MLRPC 1.5(a) do not counsel a different conclusion. For example, MLRPC 1.5(a)(2) suggests consideration of whether the representation will "preclude other employment of the lawyer," but Ms. Camus' workload at the time was only six to eight cases. We agree with Judge North that Ms. Camus' $100,096.48 legal bill was unreasonable and a violation of MLRPC 1.5(a).

█ The belated and unreasonable bill was not Ms. Camus' only regrettable decision regarding financial matters. On Ms. Camus' advice, Ms. Eyles transferred $11,900 from a bank account, held jointly with her estranged husband, into Ms. Camus' trust account for safekeeping. Ms. Camus did not notify Ms. Eyles' husband or his counsel that she had received the funds, thus violating MLRPC 1.15(d) ("Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person."). Ms. Camus later took the $11,900, in its entirety, for herself, purportedly for legal fees. She did this without informing Ms. Eyles or obtaining her permission, and without keeping any record of the transaction. In doing so, she disregarded her obligations under MLRPC 1.15(a) ("A lawyer shall hold property of clients or third persons that is in a

---

13. Both of Ms. Eyles' other attorneys in the case agreed that the prenuptial agreement would be enforceable.

lawyer's possession . . . separate from the lawyer's own property"). Ms. Camus portrays the dispute about the trust account funds as a genuine misunderstanding as to the purpose of the funds. She argues that, because her client had already given her $8,000 to cover requested legal fees without asking for a billing statement, she believed that she could draw from the $11,900 in the trust account without informing Ms. Eyles that she was doing so. The logic of this explanation escapes us.

■ As was the case in her relationship with Ms. Martin, Ms. Camus' misconduct did not terminate with the termination of the attorney-client relationship. Under MLRPC 1. 16, Ms. Camus had a duty to protect Ms. Eyles' interests even after the termination of the representation. Ms. Camus refused to release files to Ms. Eyles' new attorney until her fees had been paid, even though she had not yet provided Ms. Eyles with a bill. Despite promising to turn the files over to the successor attorney, she never did so. In her exceptions, Ms. Camus conceded that she violated MLRPC 1.16 in failing to turn over Ms. Eyles' file to successor counsel, but asserts that she did not intend to injure the client by her inaction.

In connection with the Commission's investigation of her conduct, Ms. Camus failed to provide timely answers to Bar Counsel's inquiries. She repeatedly missed deadlines and requested extensions during May and June 2010. Those delays were minor when compared to the more than 15 months that passed before Ms. Camus replied to Bar Counsel's July 14, 2010 inquiry about her representation of Ms. Eyles. This consistent inability to comply with reasonable deadlines set by Bar Counsel violated MLRPC 8.1(b), which states that a lawyer shall not "knowingly fail to respond to a lawful demand for information" from a disciplinary authority.[14]

---

14. In her exceptions, Ms. Camus contends that she did not "knowingly" fail to respond to Bar Counsel. In light of the clearly stated requests in Bar Counsel's July 14, 2010 letter, Judge North did not credit her testimony that she was "confused" by the Commission's process.

■ Finally, these numerous instances of misconduct also violated various sections of MLRPC 8.4. Wilful misuse of trust funds deposited in an attorney trust account is a criminal act. *See* Maryland Code, Business Occupations & Professions Article, § § 10–303, 10–606(b). In taking the $11,900 from the trust account for herself—without informing Ms. Eyles or receiving her authorization—Ms. Camus "committed a criminal act that reflects adversely on [her] honesty, trustworthiness or fitness as a lawyer in other respects" and therefore violated MLRPC 8.4(b).[15] Such misappropriation is also "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of MLRPC 8.4(c). Furthermore, in requesting a continuance of the February 5 hearing on the enforceability of the prenuptial agreement, Ms. Camus told the circuit court that extra time was needed because the forensic psychologist was unprepared. This was not true; the psychologist had indicated that he would be ready for the hearing and had, in fact, been prepared to testify on January 28. This false statement to the court also constituted "conduct involving dishonesty, fraud, deceit or misrepresentation." These actions by Ms. Camus may likewise be characterized as "conduct that is prejudicial to the administration of justice" under MLRPC 8.4(d).

## Sanction

■ The Commission recommends that Ms. Camus be disbarred. The misconduct that most strongly merits this sanction is her misappropriation of the $11,900 that Ms. Eyles had transferred into her trust account. Such misconduct typically

---

15. Although Judge North found that Ms. Camus violated MLRPC 8.4(b), she characterized Ms. Camus' conduct as "arguably criminal." It is not entirely clear whether the judge's use of a qualifying adverb was based on the fact that Ms. Camus had not been charged with, or convicted of, a criminal offense—which is not a prerequisite to a violation of MLRPC 8.4(b)—or expressed a question as to whether Ms. Camus had the requisite criminal intent—which is a necessary for a "criminal act." In any event, we believe that the requisite intent may be inferred from the record and agree that Ms. Camus violated MLRPC 8.4(b). *See generally Attorney Grievance Comm'n v. Palmer,* 417 Md. 185, 198–99, 9 A.3d 37, 45–46 (2010).

results in disbarment. "It has long been the rule in this State that absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment." *Attorney Grievance Comm'n v. Vlahos,* 369 Md. 183, 186, 798 A.2d 555, 556 (2002); *see also Attorney Grievance Comm'n v. Gallagher,* 371 Md. 673, 810 A.2d 996 (2002).

Even if we were inclined to give Ms. Camus the benefit of the doubt with respect to the disposition of the $11,900, the record of this proceeding reveals a pattern of conduct marked by indifference toward and neglect of clients, disregard of a court order, cavalier treatment of trust funds, and an unreasonable and retaliatory bill. In one case, Ms. Camus, while receiving six months of free housekeeping for her services, did not take the rudimentary step of entering her appearance, despite direction from her client and the court. In the other case, Ms. Camus encouraged her client to transfer funds into a trust account for safekeeping, and then took those funds without the client's knowledge or consent. When the client terminated her services and contacted the disciplinary authority, Ms. Camus responded with a large bill and an attorney's lien. Ms. Camus was recklessly indifferent to one client and selfishly exploited the other.

Ms. Camus has proffered various circumstances in mitigation, including that she was overburdened by her caseload, had a thyroid illness, and has now changed her ways by forswearing family law for a practice focused on entertainment law. She contends that her failure to enter an appearance in Ms. Martin's case had a minimal practical impact, as she was present at all court proceedings that she was required to attend and opposing counsel understood her to be Ms. Martin's attorney. She maintains that any misconduct that did occur in her representation of either Ms. Martin or Ms. Eyles was unintentional.

These considerations, however, are not compelling enough to overcome the seriousness of the misconduct, regardless of whether it was purposeful or simply irresponsible. Whatever

sympathy we may have for the situation of the sole practitioner, our primary concern in this context is protection of the public.[16] On the record of this proceeding disbarment is the appropriate sanction.

**Exceptions overruled and Respondent is disbarred; it is so ordered; Respondent shall pay all costs as taxed by the Clerk of this Court, including costs for all transcripts, pursuant to Maryland Rule 16–761, for which sum judgment is entered in favor of the Attorney Grievance Commission against Constance A. Camus; order to take effect upon filing.**

---

16. *E.g., Attorney Grievance Comm'n v. Calhoun,* 391 Md. 532, 570, 894 A.2d 518, 541 (2006).