*Attorney Grievance Commission of Maryland. v. Anne Margaret Miller*, Misc. Docket AG No. 40, September Term 2018.  Opinion by Greene, J.

**ATTORNEY GRIEVANCE — DISCIPLINE — DISBARMENT**

The Court of Appeals held that disbarment is the appropriate sanction where an attorney's protracted involvement in adoption proceedings resulted in, among other violations, a litany of misrepresentations to her clients and Bar Counsel.  Respondent Anne Margaret Miller violated Rules 1.3 (Diligence), 1.4(a) and (b) (Communication), 1.5(a) (Fees), 8.1(a) and (b) (Bar Admission and Disciplinary Matters), and 8.4(a), (b), and (c) (Misconduct).

**ATTORNEY GRIEVANCE — DISCIPLINE — DISBARMENT**

The Court of Appeals held that, although Respondent Anne Margaret Miller suffered from Post-traumatic Stress Disorder ("PTSD"), her PTSD was not the "root cause" of her misconduct under *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001), and therefore, given the intentionally dishonest nature of her actions, did not warrant a sanction lesser than disbarment.

Circuit Court for Baltimore City
Case No. 24-C-18-007035
Argued: November 4, 2019

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No.  40

September Term, 2018

_____

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

ANNE MARGARET MILLER

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Greene Jr., Clayton
  (Senior Judge, Specially Assigned)

JJ.
_____

Opinion by Greene, J.
_____

Filed:  January 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This attorney discipline case arises out of an attorney's misrepresentations to her client concerning an adoption and subsequent misrepresentations the attorney made to the Attorney Grievance Commission of Maryland ("Bar Counsel") throughout its investigation of complaints lodged against the attorney. Anne Margaret Miller and her client, R.W.,[1] met in 2015. Based on events which occurred throughout this representation, R.W. filed a complaint with the Attorney Grievance Commission that ultimately led to Bar Counsel filing a "Petition for Disciplinary or Remedial Action" ("Petition") against Ms. Miller.

Pursuant to Md. Rule 19-721(a), Bar Counsel filed its Petition with this Court on December 12, 2018. Therein, Bar Counsel averred that Ms. Miller's conduct throughout her representation of R.W. ran afoul of several provisions of the MARPC.[2] More specifically, Bar Counsel alleged that Ms. Miller violated Rules 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.16 (Declining or Terminating Representation), 8.1 (Bar Admission and Disciplinary Matters), and 8.4 (Misconduct).

On December 18, 2018, we ordered that the case be transmitted to the Circuit Court for Baltimore City to hold a hearing under Maryland Rule 19-727. The Honorable Charles H. Dorsey, III ("hearing judge") held a hearing in the matter on May 17 and 20, 2019.

---

[1] We refer to Ms. Miller's client and related parties by their initials to protect the confidentiality of the underlying adoption.

[2] On July 1, 2016, the Maryland Lawyer's Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and codified in Title 19 of the Maryland Rules. Bar Counsel alleged that some of Ms. Miller's conduct occurred both prior to July 1, 2016 and after July 1, 2016. At the time of Bar Counsel's filing on December 12, 2018, the Rules were codified as the MARPC. For purposes of consistency, we shall refer to the Rules as they are currently codified as the MARPC throughout this opinion.

Before the circuit court, Bar Counsel withdrew its allegation that Ms. Miller violated MARPC 1.16, and Ms. Miller conceded that her conduct constituted violations of both MARPC 1.4 and 8.4(a). Ms. Miller denied the remaining allegations of misconduct. As a result of that hearing, Judge Dorsey issued Findings of Fact and Conclusions of Law, as required under Maryland Rule 19-727(d), in which he found by clear and convincing evidence that Ms. Miller violated MARPC 1.3, 1.4(a) and (b), 1.5(a), 8.1(a) and (b), and 8.4(a), (b), and (c). Based on the record before us, we are convinced that the evidence adduced at the hearing clearly and convincingly supports the hearing judge's conclusions of law concerning Ms. Miller's violations of the MARPC.

### The Hearing Judge's Factual Findings and Conclusions of Law.

We summarize the hearing judge's findings of fact as follows:

Ms. Miller was admitted to the Maryland Bar on June 24, 1998. At all relevant times, Ms. Miller maintained a law office in Baltimore City as a sole practitioner. She focused her practice on panel work for the Office of the Public Defender, private criminal defense, and guardianship work. Prior to June 2015, Ms. Miller had completed two or three adoption cases.

Ms. Miller met R.W. in 2015 at R.W.'s brother's wedding. Ms. Miller had previously represented R.W.'s brother. At the wedding, R.W. informed Ms. Miller that she and her soon-to-be husband, M.W., wished to adopt her grandniece N.R. R.W. had been awarded custody and guardianship of N.R. by the Circuit Court for Baltimore City in March of 2009. N.R.'s mother suffered from issues with substance abuse, and the identity of N.R.'s biological father was unknown. After the wedding, R.W. contacted Ms. Miller

to discuss representation and the adoption generally.  Ms. Miller indicated to R.W. that the adoption would likely cost $5,000 or more.

Prior to entering an attorney-client relationship, R.W. informed Ms. Miller that she wanted to have the adoption completed by July 30, 2016, the date she and M.W. were scheduled to marry, because she and her future husband wished to announce the adoption at the wedding.  The hearing judge noted that, although Ms. Miller informed R.W. that the adoption process may not be complete by this date, Ms. Miller was aware that this deadline was "significant" to R.W.  Thereafter, R.W. retained Ms. Miller to represent her in the adoption proceedings.

The parties disputed the circumstances leading up to execution of the retainer agreement.  Ms. Miller contended that she provided R.W. with two copies of the retainer agreement, R.W. signed one of them, and M.W. delivered the signed retainer agreement to Ms. Miller's office on July 7, 2015.  Ms. Miller maintained that she had never visited R.W.'s home.  In contrast, R.W. testified that Ms. Miller brought the retainer agreement to her home on July 7, 2015, she signed the agreement, made a copy, and provided Ms. Miller with the copy.  The hearing judge found R.W.'s testimony on this point more credible, because she introduced the original retainer agreement into evidence and rejected Ms. Miller's account of the events.

The retainer agreement indicated that Ms. Miller would charge $275 per hour and requested a $2,500 retainer.  R.W. delivered a $2,500 cashier's check to Ms. Miller to cover the retainer.   The retainer agreement also indicated that the adoption proceedings would

cost between $3,000 and $5,000 in total. R.W. testified that she and M.W. had set aside sufficient funds to cover the estimated cost of the adoption.

The hearing judge found that, by August 15, 2015, Ms. Miller had prepared a "Petition for Adoption", affidavits for both R.W. and M.W. to sign, a "Motion to Waive Publication", a "Motion to Waive Investigation", and the "Consent of Biological Parent to Adoption." He also found that the papers and pleadings drafted by Ms. Miller "were not complex and generally contained boilerplate language." Although Ms. Miller testified that she provided R.W. with the first monthly invoice, dated August 15, 2015, in a letter accompanying drafts of initial pleadings, R.W. testified that this letter did not contain a copy of the invoice. The hearing judge found R.W.'s testimony more credible and rejected Ms. Miller's assertion.

On September 16, 2015, Ms. Miller emailed R.W. a draft of the adoption petition. She also advised R.W. that she required several documents to effectuate the adoption proceedings.[3] On October 26, 2015, Ms. Miller, in an email correspondence, provided R.W. with a copy of the "Consent of Biological Parent to Adoption" that N.R.'s biological mother needed to sign. In that email, Ms. Miller indicated to R.W. that she required one final form "from the Department of Health," and that, after they met with the biological mother and obtained her signature, the petition for adoption would be ready to file. The

---

[3] Specifically, she advised R.W. that she required R.W. and M.W.'s 2014 tax returns, a certified copy of N.R.'s birth certificate, and statements of health concerning R.W. and M.W. signed by physicians.

hearing judge concluded that R.W. provided the documents necessary to file the adoption petition to Ms. Miller on or before December 10, 2015.

On December 10, 2015, Ms. Miller traveled to R.W.'s home to meet with the child's biological mother. At this meeting, the child's biological mother executed a consent to the petition for adoption and name change. Ms. Miller informed R.W. that she would file the petition for adoption and motions to waive a home visit and publication. Ms. Miller testified that she had mailed monthly invoices to R.W.'s home address and that she mentioned the outstanding balance to R.W. during the December 10, 2015 meeting. Ms. Miller testified that R.W. told her she would pay the additional balance of $2037 after Christmas. The hearing judge found Ms. Miller's testimony incredible and determined that R.W. was not aware of any outstanding balance as of December 10, 2015. Primarily, the hearing judge determined that Ms. Miller's testimony, *i.e.* that she sent R.W. monthly invoices, was unsubstantiated. The hearing judge also rejected Ms. Miller's testimony that she informed R.W. that she would not file the petition for adoption until after the outstanding balance had been paid. The hearing judge also found that Ms. Miller failed to file a motion to waive home study as she had previously represented to R.W.

Additionally, the hearing judge rejected Ms. Miller's testimony that she and R.W. had a heated telephone conversation in February 2016, where Ms. Miller testified that she called R.W. to discuss payment. Ms. Miller testified that R.W. informed her that she did not intend to pay until Ms. Miller appeared on her behalf in court, and, when she requested payment in full, R.W. responded belligerently by raising her voice, cursing, and calling Ms. Miller names. The hearing judge determined that Ms. Miller's testimony was again

unsubstantiated, because it was inconsistent with cordial text messages exchanged between R.W. and Ms. Miller on April 22, 2016 and R.W.'s testimony that no such dispute occurred.

Between December 10, 2015 and April 22, 2016, R.W. contacted Ms. Miller by phone on several occasions. In each phone call, R.W. inquired as to the date the adoption would be finalized. In response to her inquiry, Ms. Miller misled her to believe that the petition for adoption had been filed, and occasionally represented that she needed to visit the clerk's office to check on the status of the case. The hearing judge determined that Ms. Miller did not request additional funds from R.W. at that time. Similarly, between April and October of 2016, Ms. Miller and R.W. exchanged several text messages in which Ms. Miller misled R.W. to believe that she had filed the petition for adoption. Again, in the text messages, Ms. Miller represented to R.W. that she would visit the clerk's office to determine the status of the case, but Ms. Miller ultimately failed to do so.[4] Ms. Miller conceded that she intentionally misrepresented the status of the petition for adoption to R.W. to delay resolution of the case in hopes of receiving payment from R.W.

R.W. only became aware of any outstanding balance from Ms. Miller on September 7, 2016 through an exchange of text messages. The hearing judge rejected Ms. Miller's assertions that the two had three discussions regarding an outstanding balance that R.W. owed Ms. Miller. The hearing judge found that, as of mid-October 2016, Ms. Miller had

---

[4] Ms. Miller misrepresented to R.W. that she would go to the clerk's office to inquire as to the status of the adoption proceedings on at least four occasions: (i) May 5, 2016; (ii) August 17, 2016; (iii) September 7, 2016; and (iv) October 12, 2016. Ms. Miller, however, never filed the petition for adoption and therefore had no intention of visiting the clerk's office to inquire about the status, because the case had not yet been filed.

not yet filed the petition for adoption on behalf of R.W. Thus, as a result of Ms. Miller's delay, she required R.W. and M.W. to sign updated affidavits and provide additional tax returns.

On October 26, 2016, Ms. Miller met with R.W. and M.W. at R.W.'s home and obtained M.W.'s signature on the updated affidavit. Two days later, Ms. Miller met with R.W. outside of her work and had R.W. sign her own updated affidavit. At this point, Ms. Miller apologized to R.W. for the delay in the proceedings and offered to draft wills for R.W. and M.W. free of charge to compensate them for the delay. Upon noticing that R.W. had purchased a new vehicle, Ms. Miller inquired as to when R.W. would make an additional payment. R.W. indicated that she would provide the funds to Ms. Miller when she obtained a hearing date for the adoption.

During October, R.W. apparently became suspicious of the delay and conducted her own investigation into the matter. She inquired with the clerk's offices in Baltimore City and County and discovered that Ms. Miller had not filed the petition for adoption, as she had consistently represented to R.W. Ms. Miller testified that, in October 2016, she admitted to R.W. that she had not filed the petition for adoption. The hearing judge rejected her testimony based upon a December 5, 2016 text message in which R.W. stated "[g]ood morning, what's the status on court date?" Therefore, the hearing judge concluded that R.W. was still under the false impression that Ms. Miller was still pursuing the petition for adoption in December of 2016.

The hearing judge found that, in December of 2016, Ms. Miller and R.W. spoke via telephone and Ms. Miller admitted that she had not filed the petition for adoption. During

this call, Ms. Miller informed her client that Ms. Miller would set a court date when she was paid in full. The hearing judge accepted R.W.'s testimony that this was the first instance she learned that Ms. Miller refused to take any action in the case until she received further payment. Throughout December of 2016, R.W. and Ms. Miller exchanged several phone calls. R.W. referred to one of these calls as "rough" and indicated that she hung up on Ms. Miller, after Ms. Miller's requests for additional payment, to avoid cursing at Ms. Miller. The hearing judge found R.W. was upset with Ms. Miller, because she felt that Ms. Miller had repeatedly misled her regarding the status of her case in efforts to obtain further payment.

The hearing judge found that R.W. had sufficient capital to cover the adoption proceedings and that "money was never a factor." Ms. Miller alleged that she had sent monthly invoices to R.W. between August 2016 and January 2017 and that R.W. failed to make any payment pursuant to these invoices. The hearing judge rejected Ms. Miller's testimony and found that R.W. did not receive any invoices that Ms. Miller allegedly sent her between August 2015 and December 2016. R.W. testified that she only received two invoices—one dated October 26, 2016 and the other dated January 23, 2017.

In December, Ms. Miller called R.W. and apologized to her. R.W. initially refused to make further payment for Ms. Miller's services, but later agreed to a revised payment agreement. Under this agreement, R.W. agreed to pay half of the outstanding balance when Ms. Miller provided her with proof that the petition for adoption was filed, and R.W. would then pay the remaining amount of the outstanding balance on the day of the hearing. Between December of 2016 and January of 2017, R.W. sent several text messages to Ms.

Miller inquiring about the status of the case. Eventually, Ms. Miller responded that she was "waiting to be paid." Because of Ms. Miller's inability to prove that she filed the petition for adoption, R.W. then terminated her attorney-client relationship with Ms. Miller via email on January 19, 2017. In the email where R.W. indicated that she terminated the attorney-client relationship, R.W. requested a copy of her client file. On January 24, 2017, Ms. Miller met with R.W. at her home and provided her with some of the relevant documents and an invoice for an outstanding balance of $2,450, which R.W. did not pay.[5] In January of 2017, R.W. hired another attorney to complete the adoption, paid that attorney $2,500 to complete it, and the adoption was completed on September 29, 2017.

*Investigation by Bar Counsel*

In regard to Bar Counsel's investigation of Ms. Miller's underlying conduct, the hearing judge made several findings of fact, including the following:

(i) That Ms. Miller knowingly and intentionally misrepresented to Bar Counsel that she had provided R.W. with monthly invoices and that R.W. refused to make additional payments.

(ii) That R.W.'s client file that Ms. Miller provided to Bar Counsel included a copy of the June 23, 2015 retainer agreement that differed from the one she provided in her initial response to Bar Counsel's inquiry. The second retainer agreement did not contain a clause that "payment is due immediately upon receipt of the invoice for attorney fees, costs[,] and expenses."[6]

---

[5] Ms. Miller provided R.W. with an original signed copy of the Consent of Biological Parent to the Adoption, the original documents R.W. provided to Ms. Miller, and an invoice charging R.W. $4,950 for the representation. Given the $2,500 retainer R.W. paid to Ms. Miller, the remaining balance was $2,450.

[6] The hearing judge noted that Ms. Miller was unable to account for the differences between the two retainer agreements. He explained that Ms. Miller seemed to suggest that she (cont'd . . .)

(iii)    That the retainer agreement Ms. Miller provided to R.W. did not contain such a provision.

(iv)    That Ms. Miller, in response to Bar Counsel's requests for documents relating to her representation of R.W., provided Bar Counsel with copies of the invoices she allegedly sent to R.W., but failed to submit copies of email and text message correspondences between her and R.W.

(v)    That Ms. Miller, in December 2015, in response to a request by Bar Counsel, submitted a document titled "Legal Services Performed for [R.W.] in the Matter of the Adoption of [N.R.]" which delineated sixteen and a half hours of work that Ms. Miller performed. Fees corresponding to these hours were included in the August invoice purportedly sent to R.W. The hearing judge concluded that the timesheet provided by Ms. Miller contradicted her earlier testimony concerning the invoices she allegedly sent to R.W. Ms. Miller conceded that she knew the timesheet she provided to Bar Counsel was inaccurate at the time she submitted it.

(vi)    That Ms. Miller falsified the hours she worked on R.W.'s case in an attempt to "justify not placing the $2,500 received from R.W. into an attorney trust account as required by Rule 1.15(c)."

*The Hearing Judge's Conclusions of Law*

Based on the facts adduced at the hearing, the hearing judge made several conclusions of law, which we summarize as follows.

Ms. Miller violated MARPC 1.3 by failing to act with reasonable diligence through her failure to file the petition for adoption on behalf of R.W. In fact, the hearing judge found that Ms. Miller deliberately delayed resolution in R.W.'s case for over a year. Ms. Miller violated MARPC 1.4(a) and (b), as she had conceded in her responses to Bar Counsel. More specifically, Ms. Miller violated MARPC 1.4(b) by failing to inform R.W.

_____

(. . . cont'd)

received a different copy of the retainer agreement from Bar Counsel, *i.e.* a copy of the agreement that R.W. provided to Bar Counsel. Ms. Miller, however, conceded that R.W. did not provide Bar Counsel with a copy of the retainer agreement. Instead, R.W. introduced her signed copy of the retainer agreement at the hearing.

- 10 -

that the petition for adoption had not been filed.  In addition, Ms. Miller violated MARPC 1.4(a) by failing to keep R.W. informed as to any outstanding balances.

Ms. Miller violated MARPC 1.5(a), because the $4,950 she charged R.W. in attorney's fees was unreasonable.  The hearing judge found that, although the fee would ordinarily be reasonable, it was unreasonable because Ms. Miller consistently delayed taking any action in the case and "failed to provide R.W. with any services of value."  The hearing judge, however, did not find that Ms. Miller violated MARPC 1.15.[7]

Ms. Miller violated MARPC 8.1(a) in several ways: (i) misrepresenting to Bar Counsel that she sent monthly invoices to R.W.; (2) providing Bar Counsel with an altered retainer agreement; and (3) falsifying the timesheet she submitted to Bar Counsel.  Similarly, Ms. Miller violated MARPC 8.1(b) by failing to comply with all of Bar Counsel's lawful requests for documentation.  Ms. Miller violated MARPC 8.4(a), because she violated other provisions of the MARPC.  Additionally, the hearing judge concluded that Ms. Miller violated MARPC 8.4(c) when she misrepresented to R.W. that she had filed the petition for adoption, misrepresented to R.W. that she had filed a motion to waive home study, misled R.W. as to the status of the adoption proceedings, provided R.W. with a falsified invoice dated October 26, 2016, and through her failure to comply with MARPC

---

[7] MARPC 1.15 concerns an attorney's safekeeping of property.  Under its provisions, and relevant to the instant proceedings, attorneys are required to deposit advanced fees in attorney trust accounts.  In his application of MARPC 8.1 to the facts, the hearing judge commented that he "rejects [Ms. Miller's] testimony and finds that she knowingly and intentionally submitted the falsified timesheet to Bar Counsel and intentionally altered the hours she worked to justify not placing the $2,500 received from R.W. into an attorney trust account as required by Rule 1.15(c)."  Despite this finding, he did not find that Ms. Miller violated MARPC 1.15.

8.1(a) throughout Bar Counsel's investigation. The hearing judge also concluded that Ms. Miller violated MARPC 8.4(d), because her conduct, in its entirety, brought the legal profession into disrepute.

*The Hearing Judge's Findings as to Mitigation and Aggravation*

Before the hearing judge, Ms. Miller made several arguments in favor of mitigation: (i) an absence of prior discipline; (ii) emotional problems; (iii) mental disability; (iv) timely good faith efforts to make restitution or rectify the consequences of her misconduct; (v) full and free disclosure to the disciplinary board; (vi) good character or reputation; (vii) the imposition of other penalties or sanctions; (viii) remorse; and (ix) that she would be unlikely to repeat the misconduct.

First, the hearing judge rejected Ms. Miller's contentions concerning the interplay between her mental illness and her misconduct in representing R.W. The hearing judge found that Ms. Miller's mental health conditions did not meet the standard for mitigation established by this Court in *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001).

Second, the hearing judge found that Ms. Miller's return of R.W.'s funds was not made in good faith, because she did not return them until January 31, 2019, months after R.W. terminated her representation and Bar Counsel instituted its investigation. Instead, the hearing judge found that the refund was based on self-preservation. Third, the hearing judge found that Ms. Miller's good reputation in the legal community was a mitigating factor. Fourth, Ms. Miller argued that the mitigation standard concerning the imposition of other sanctions was met, because she returned R.W.'s funds. The hearing judge, based

- 12 -

on his earlier interpretation that the refund was not made in good faith, rejected her assertions of mitigation.

Fifth, the hearing judge found that Ms. Miller's remorse was feigned and not a mitigating factor, because she consistently blamed R.W. for her failure to file the petition for adoption. Sixth, the hearing judge determined that the unlikelihood of repetition was not a mitigating factor. He determined that, it was too speculative to assume that Ms. Miller would not engage in similar conduct in the future, based on the evidence submitted. Accordingly, the only mitigating factor found by the hearing judge was that Ms. Miller maintained a good reputation within the legal community.

In terms of aggravating factors, Bar Counsel alleged the existence of several: (i) a dishonest or selfish motive; (ii) a pattern of misconduct; (iii) multiple offenses; (iv) submission of false statements during the disciplinary process; and (v) substantial experience in the practice of law. The hearing judge found that Ms. Miller acted with a dishonest or selfish motive, committed multiple violations of the MARPC, submitted false statements to Bar Counsel throughout the investigation, and had substantial experience in the practice of law. The hearing judge did not, however, find that Ms. Miller engaged in a pattern of misconduct, because the allegations of misconduct stemmed from a single incident. The hearing judge submitted his findings of fact and conclusions of law to this Court on July 3, 2019.

## DISCUSSION

*Ms. Miller's Exceptions to the Hearing Judge's Findings of Fact*

We have reiterated the well settled proposition that

this Court exercises original jurisdiction over attorney discipline proceedings. We conduct an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous. We will not disturb the factual findings of the hearing judge if they are based on clear and convincing evidence. Our review of the hearing judge's conclusions of law is *de novo*.

*Attorney Grievance Comm'n v. Christopher*, 383 Md. 624, 638, 861 A.2d 692, 700 (2004) (quoting *Attorney Grievance Comm'n v. Gore*, 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004)). *See also* Md. Rule 19-741 ("The Court of Appeals shall review *de novo* the circuit court judge's conclusions of law."); *Attorney Grievance Comm'n v. Tanko*, 408 Md. 404, 419, 969 A.2d 1010, 1019 (2009) ("If the hearing judge's factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled.").

The clearly erroneous standard also applies in situations where an attorney files exceptions to the hearing judge's findings of fact. *Attorney Grievance Comm'n v. Marcalus*, 414 Md. 501, 512, 996 A.2d 350, 356 (2010) (citing *Attorney Grievance Comm'n v. Mba-Jonas*, 402 Md. 334, 344, 936 A.2d 839, 844 (2007)). This standard is met where the hearing judge's factual findings are supported by "any competent material evidence[.]" *Attorney Grievance Comm'n v. Robbins*, 463 Md. 411, 443, 205 A.3d 1034, 1052 (2019), *reconsideration denied* (May 16, 2019) (quoting *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 16, 85 A.3d 117, 125 (2014)). Having established the applicable standard of review, we now turn to Ms. Miller's exceptions.

Ms. Miller makes a multitude of exceptions to the hearing judge's findings of fact and conclusions of law. We will examine them individually, beginning with her exceptions

to the hearing judge's findings of fact. A substantial number of Ms. Miller's exceptions to the hearing judge's findings of fact may be stylized as contesting Judge Dorsey's credibility determinations. Therefore, we must first briefly review this Court's precedent on the central role a hearing judge occupies in determining the credibility of witnesses in the attorney grievance context.

Generally, a hearing judge maintains a great deal of discretion in determining which evidence to rely upon. *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230, 198 A.3d 835, 847 (2018); Md. Rule 19-741 (indicating that this Court "shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."). Further, "[i]n making his or her findings of fact, [t]he hearing judge is permitted to pick and choose which evidence to rely upon from [the] conflicting array [of facts presented]." *Attorney Grievance Comm'n v. Merkle*, 440 Md. 609, 626–27, 103 A.3d 679, 690 (2014) (internal quotation marks omitted).

The underlying justification for our deference to the hearing judge's credibility determinations is based on the premise that the hearing judge is "in the best position to assess the credibility of a witness." *Attorney Grievance Comm'n v. Pak*, 400 Md. 567, 595, 929 A.2d 546, 562–63 (2007) (citing Md. Rule 16-759(b)(2)(B) and *Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006)). *See also Attorney Grievance Comm'n v. Kepple*, 432 Md. 214, 226, 68 A.3d 797, 803 (2013), (noting that "the hearing judge was in the best position 'to evaluate the veracity of the respondent's explanation' regarding the alleged violation of the [MARPC]." (quoting *Tanko*, 408 Md. at 420, 969 A.2d at 1020)), *reinstatement granted sub. nom.*, *In re Reinstatement of Kepple*,

- 15 -

434 Md. 318, 75 A.3d 322 (2013). As evident, we afford a great deal of deference to the hearing judge's credibility determinations. We now begin our analysis of Ms. Miller's exceptions to the hearing judge's findings of fact.

*Exception One*

First, Ms. Miller takes exception to the hearing judge's factual findings that Ms. Miller only sent R.W. two invoices throughout the representation and that the thirteen additional invoices proffered by Ms. Miller were falsely created. She argues that the hearing judge "gave great weight" to the fact that the invoices were addressed to "R.R.-W." with the W. indicating her husband's surname.[8] Ms. Miller posits that, the August 15, 2015 invoice, which R.W. conceded she received was addressed in a similar fashion, and this demonstrates that Ms. Miller addressed all of her correspondences in that manner.

Before the hearing judge, Ms. Miller testified that she had sent fifteen invoices in total. R.W. testified that she had only received two. Before this Court, Ms. Miller contends, based on the conflicting testimony set forth at the hearing, the hearing judge could not have found by clear and convincing evidence that R.W. received only two invoices.[9] Ms. Miller characterizes this action by the hearing judge as impermissibly shifting the burden of proof to her and therefore argues that this factual finding was not supported by clear and convincing evidence.

---

[8] At the start of Ms. Miller's representation of R.W., prior to her marriage to M.W., her name was actually "R.R." All of the invoices Ms. Miller allegedly sent to R.W., before and after her marriage to M.W., were addressed to "R.R.-W."

[9] Ms. Miller fails to identify any precedent in support of the proposition that the hearing judge is not permitted to credit the testimony of one witness over another.

- 16 -

The hearing judge, in the instant attorney grievance proceedings, stated that he "accept[ed] R.W.'s testimony and reject[ed] [Ms. Miller's]" in making this finding. Clearly, the hearing judge found R.W.'s testimony more credible than that provided by Ms. Miller. Although the hearing judge pointed out Ms. Miller's failure to provide the court with the original electronic versions of the invoices to demonstrate the date they were made, the hearing judge did not impermissibly shift the burden to Ms. Miller. Instead, this aspect, and that concerning the inclusion of R.W.'s maiden name, merely constitute the grounds, in part, upon which the hearing judge determined R.W.'s testimony was more credible than that of Ms. Miller.

In addition, Ms. Miller's contentions are contradicted by evidence contained within the record. Specifically, her testimony that she sent R.W. monthly invoices conflicts with a text message she sent to R.W. on August 3, 2016. In that message, Ms. Miller stated, "[by the way] I sent you a second bill. When are you paying it? Thanks[.]" R.W. responded, "[w]e did not receive a second bill. The only information we received on this case is answers to questions we initiate[d]. According to you[,] nothing else has been done. Have no problem paying for services.[ ] Hope you are feeling better."

Clearly, this text message is entirely inconsistent with Ms. Miller's testimony that she provided R.W. with monthly billing invoices. If she had provided R.W. with monthly invoices, then this would have been the eleventh invoice Ms. Miller sent to R.W. Accordingly, the hearing judge was justified in rejecting Ms. Miller's testimony that she sent R.W. monthly invoices. Given this Court's deference to a hearing judge's credibility determinations, and a hearing judge's discretion in accepting or rejecting conflicting

- 17 -

testimony, we conclude that the hearing judge's factual finding on this point was not clearly erroneous. Accordingly, we overrule Ms. Miller's first exception to the hearing judge's findings of fact.

*Exception Two*

Second, Ms. Miller takes exception to the hearing judge's finding that only one copy of the retainer agreement was signed by the parties at R.W.'s home on July 7, 2015. She argues that her signature on the retainer agreement provided by R.W. is signed "Anne M. Miller[,]" while the retainer agreement provided by Ms. Miller is signed "Anne Miller." She also implicitly contends that the retainer agreement was not signed at R.W.'s house. To this end, Ms. Miller argues that, in the text messages between her and R.W. on December 10, 2015, arranging a meeting at R.W.'s home between Ms. Miller, R.W., and the child's biological mother, R.W. informed Ms. Miller of R.W.'s address. Ms. Miller contends, had she previously visited R.W.'s home, these directions would be superfluous.

As set forth above, a hearing judge maintains a great deal of latitude in determining the credibility of witnesses. With regard to the dispute over the retainer agreement, the hearing judge commented that he found "R.W.'s testimony to be more credible than [that of Ms. Miller] because at the hearing, R.W. produced the original retainer agreement in her possession, a copy of which was admitted into evidence." Moreover, the hearing judge noted that Ms. Miller submitted two differing copies of the retainer agreement to Bar Counsel throughout its investigation and was unable to explain the inconsistency between the two. Therefore, we overrule Ms. Miller's second exception.

*Exception Three*

Third, Ms. Miller takes exception to the hearing judge's finding that, throughout Bar Counsel's investigation, Ms. Miller knowingly and intentionally misrepresented that she had sent R.W. monthly bills. This exception is exceedingly similar to Ms. Miller's first exception and arises out of Ms. Miller's position that the hearing judge erred in crediting R.W.'s testimony while finding Ms. Miller's testimony incredible. As we have already determined that the hearing judge's credibility determination concerning the number of invoices Ms. Miller sent to R.W. was not clearly erroneous, we need not analyze this exception further due to the overlapping nature of the two exceptions. As with Ms. Miller's first exception, the hearing judge's finding was not clearly erroneous. Therefore, we overrule Ms. Miller's third exception to the hearing judge's findings of fact.

*Exception Four*

Fourth, Ms. Miller contends that the hearing judge's conclusion that the retainer agreement did not include the phrase "[p]ayment is due immediately upon receipt of the invoice for attorney's fees, costs, and expenses" was made in error. As with a majority of her exceptions, Ms. Miller's relies solely upon her own testimony. Ms. Miller argues that she testified she had mistakenly printed two copies of the retainer agreement and that, when R.W. requested an estimate of the total fee be included in the retainer agreement, she inadvertently deleted the "payment is due" clause. The hearing judge noted that Ms. Miller failed to substantiate her testimony and did "not provide any evidence in support of her testimony, claiming that her former attorney did not return to her the original client file." As evident, the hearing judge found R.W.'s testimony concerning the signing of the

retainer agreement, along with the copy admitted into evidence which contained the "payment is due" language, more credible than the unsubstantiated testimony of Ms. Miller. Given that R.W.'s testimony was supported by evidence in the record, and Ms. Miller was unable to substantiate her version of events, we conclude that the hearing judge did not clearly err in making this finding and overrule Ms. Miller's exception.

*Exception Five*

Fifth, Ms. Miller argues that the hearing judge was clearly erroneous in finding that she produced and submitted a fraudulent timesheet to Bar Counsel.[10] Primarily, the hearing judge found that Ms. Miller created this timesheet in an attempt to justify her depositing the $2,500 retainer she received from R.W. into her operating account instead of an attorney trust account. Again, Ms. Miller points to her own testimony in an attempt to contradict the hearing judge's factual finding. At the hearing, however, Ms. Miller acknowledged that the timesheet she submitted to Bar Counsel was not accurate and that she was aware of the inaccuracy at the time she submitted it to Bar Counsel.

The timesheet and invoices submitted by Ms. Miller to Bar Counsel throughout these proceedings play a central role in the alleged violations of the MARPC and the hearing judge's credibility determinations. Largely, Ms. Miller offered conflicting accounts of the hours of work she performed on behalf of R.W. during the underlying adoption proceedings. Accordingly, Ms. Miller's testimony, the invoices, and the

---

[10] Ms. Miller identifies two different exceptions as "Exception No. 4[.]" To accommodate for this error, we stylize this exception, the second fourth exception, as exception five and adjust the subsequent exceptions accordingly.

timesheet she submitted require a greater level of scrutiny to reveal the extent of the discrepancies and to better ascertain the deception committed by Ms. Miller. Such scrutiny will immediately follow.

As mentioned above, Ms. Miller alleged that she sent R.W. monthly invoices throughout the entirety of the representation. The invoices submitted by Ms. Miller covering a period between August 15, 2015 and November 15, 2015 are generally identical and contain the following enumeration of work performed:

| Task | Hours[11] |
| --- | --- |
| Research | 6 |
| Meetings & telephone calls | 2 |
| Preparation of pleadings | 7.5 |
| Total | 16.5 |

Accordingly, as to the first alleged invoice, dated August 15, 2015, Ms. Miller represented to R.W. that she performed fifteen and a half hours of work. Ms. Miller, however, provided conflicting accounts of the number of hours she worked throughout her deposition and testimony at the hearing.

For instance, Ms. Miller stated in her response to Bar Counsel that "[b]y July 7, 2015, [she] had already expended nearly 10 hours on the case." In contrast, however, Ms. Miller testified that she "completed about 16 hours of work between June 23 and middle

---

[11] Ms. Miller conceded during her deposition that the hours listed add up to fifteen and a half hours. She attributes the sixteen-and-a-half-hour total to sloppiness or an arithmetic error.

of July[.]" This inconsistency between the number of hours Ms. Miller testified that she worked on the case and the invoices, allegedly sent to R.W., becomes increasingly clear upon consideration of the timesheet that Ms. Miller submitted to Bar Counsel. The timesheet contained the following:

| Date | Legal Services Performed | Hours | Running totals |
|---|---|---|---|
| 06/23/15 | Client meeting | 0.7 | 0.7 |
| 06/23/15 | Legal research | 3.5 | 4.2 |
| 06/26/15 | Legal research | 2.5 | 6.7 |
| 07/03/15 | Drafted pleadings | 3.0 | 9.7 |
| 07/06/15 | Client meeting | 0.1 | 9.8 |
| 07/08/15 | Calls to [the Department of Mental Health and Hygiene] | 0.6 | 10.4 |
| 08/15/15 | Letter to client | 0.2 | 10.6 |
| 08/27/15 | Letter to client | 0.1 | 10.7 |
| 09/14/15 | Emails to client | 0.1 | 10.8 |
| 09/16/15 | Email to client | 0.1 | 10.9 |
| 10/28/15 | Email to client | 0.1 | 11.0 |
| 12/03/15 | File and document review; revised pleadings | 4.2 | 15.2 |
| 12/10/15 | Meeting with birth mother | 1.5 | 16.7 |
| 12/10/15 | Client meeting | 1.0 | 17.7 |
| 08/05/16 | Amended pleadings | 0.1 | 17.8 |
| 10/28/16 | Client meeting | 0.2 | 18.0 |
|  | **Total** | 18.0 | 18.0 |

As indicated by the timesheet Ms. Miller submitted, she performed 10.6 hours of work as of August 15, 2015. This is consistent with her statement to Bar Counsel that she completed ten hours by July 7, 2015.[12] Nonetheless, the timesheet is inconsistent with Ms. Miller's testimony that she performed sixteen hours of work by the middle of July 2015.

---

[12] As noted, the timesheet indicates that Ms. Miller performed 9.8 hours of work by July 7, 2015.

In contrast, the invoices Ms. Miller allegedly sent to R.W., in monthly intervals, indicate that she performed fifteen and a half hours of work by August 15, 2015. The invoices in the three subsequent months (September, October, and November) are identical to the August 15, 2015 invoice and also indicate that Ms. Miller performed fifteen and a half hours of work. Additionally, in her deposition Ms. Miller testified that she did not perform any work between August and November 2015. The alleged December 15, 2015 invoice indicates that Ms. Miller, at that point in time, had performed eighteen hours of work on the case. Nonetheless, the timesheet submitted by Ms. Miller shows that she did not perform eighteen hours of work in the matter until October 28, 2016.

Although Ms. Miller characterized the timesheet she submitted to Bar Counsel as "not completely accurate[,]" she stated that it is "a reasonable approximation" despite being "sloppily created[.]" Regardless of the propriety of the timesheet, the conflicting testimony and exhibits adduced by Ms. Miller give rise to an inference that Ms. Miller engaged in subterfuge throughout her representation of R.W. and Bar Counsel's investigation.

In the correspondence Ms. Miller sent to Bar Counsel, to which the timesheet was attached, Ms. Miller did not acknowledge that the contents of it were inaccurate or that it was "an artifact created to comply with Bar Counsel's request" as she now contends before this Court. Moreover, a review of her testimony, the invoices allegedly sent to R.W., and the timesheet provide conflicting accounts of the number of hours Ms. Miller worked within the period and substantiate the hearing judge's finding that Ms. Miller intentionally submitted a fraudulent timesheet to Bar Counsel.

Ms. Miller's lack of candor throughout this process had far reaching implications before the hearing judge. As previously demonstrated, the hearing judge found R.W.'s testimony credible and Ms. Miller's testimony incredible in several instances. Based on the conflicting accounts provided by Ms. Miller, the hearing judge's finding regarding her credibility was not erroneous. The record contains sufficient indication that Ms. Miller made misrepresentations to both R.W. and Bar Counsel. Those misrepresentations, in turn, substantially impair her credibility. Accordingly, the hearing judge's factual finding was not clearly erroneous. We therefore overrule Ms. Miller's exception to the hearing judge's findings of fact.

*Exception Six*

Sixth, Ms. Miller takes exception to the hearing judge's factual finding that the adoption proceedings did not contain novel or contested issues and that the pleadings and papers drafted by Ms. Miller were not complex.[13] Ms. Miller contends that the only testimony offered on this point was her own. She argues further that, any finding on this point requires expert testimony from a family law practitioner. Ms. Miller fails to identify any precedent in support of this proposition.

Contrary to Ms. Miller's position before this Court, she conceded at the hearing that the pleadings she prepared on behalf of R.W. contained "boilerplate" language. Her testimony substantiates the hearing judge's factual finding. We have previously agreed

---

[13] Ms. Miller contends that the adoption contained novel or complex issues, because N.R.'s biological mother was addicted to drugs, suffered from mental health issues, and the biological father's identity was unknown.

with a hearing judge's determination that a prenuptial agreement was not complex or novel, based upon the hearing judge's experience and knowledge alone, without requiring supporting expert testimony. *Attorney Grievance Comm'n v. Camus*, 425 Md. 417, 432, 42 A.3d 1, 9 (2012). Furthermore, the adoption in this case was consented to by the child's mother, which is generally less complex than adoptions to which the child's parent does not consent.

Additionally, a substantial majority of the motions and accompanying documents completed by Ms. Miller and submitted to Bar Counsel were, in fact, modified Maryland forms. The motion prepared by Ms. Miller titled "Consent of Parent to an Independent Adoption of [N.R.]" is based entirely on Maryland Form 9-102.4. In fact, there are only slight differences between that form and the motion drafted by Ms. Miller. These differences are found solely in instances where the form contains blanks for attorneys to fill-in.[14] The only petitions or motions independently drafted by Ms. Miller were: (i) the petition for adoption and name change; (ii) the motion to waive home study; (iii) the affidavits of R.W. and M.W.; (iv) the motion to waive publication; and (v) the accompanying draft orders. In total, these papers contain only seven pages of substantive

---

[14] In her correspondence with Bar Counsel that included the pleadings and motions, Ms. Miller did not include metadata for the documents she drafted and submitted to the court. She did, however, provide the metadata of certain Maryland forms. The accompanying metadata indicates that a majority of these forms were reviewed for one minute. The metadata of one form, however, indicates that Ms. Miller or her staff edited the document for 200 minutes. This is inherently puzzling considering that the form did not contain any independent contributions from Ms. Miller.

material independently drafted by Ms. Miller.[15]  As evident, the hearing judge's conclusion that the adoption proceedings were neither novel nor complex was not clearly erroneous. Therefore, we overrule this exception.

*Exception Seven*

Ms. Miller next excepts to the hearing judge's finding that R.W. was not aware of any outstanding balance that she owed Ms. Miller and that Ms. Miller had not requested additional payments from R.W.  This exception is inherently intertwined with Ms. Miller's first exception, where she took exception to the number of invoices the hearing judge found she had sent to R.W.  Again, the primary thrust of Ms. Miller's argument is that the hearing judge erred in finding R.W.'s testimony more credible than her own.  As indicated *supra*, the hearing judge is in the best position to ascertain the credibility of a witness and we generally defer to the hearing judge's credibility determinations.  *See Guida*, 391 Md. at 50, 891 A.2d at 1095.  With this in mind, our independent review of the record reveals that the hearing judge's credibility determination was not clearly erroneous.  We therefore overrule Ms. Miller's exception.

*Exception Eight*

Eighth, Ms. Miller takes exception to the hearing judge's factual finding that an alleged heated conversation between her and R.W. did not occur in February of 2016.  In support of her claim, Ms. Miller contends that the record clearly demonstrates that this exchange occurred based on several pieces of testimony: (i) testimony by Ellen Kay

---

[15] This total excludes the certificates of service and proposed draft orders.

Tannen and Dr. Christine Tellefsen corroborating Ms. Miller's account of the exchange; [16] (ii) Ms. Miller's testimony and deposition; (iii) R.W.'s testimony that the two had "several . . . rough conversations[;]" and (iv) the break in communication between R.W. and Ms. Miller from February through April of 2016.

According to Ms. Miller's testimony, sometime within the first week of February, she and R.W. participated in a phone conversation where Ms. Miller informed R.W. that she would not file the adoption papers until she received further payment. According to Ms. Miller, R.W. became irate, called her expletives, and one of the two hung up the phone. In her testimony before the hearing judge, Ms. Tannen testified that Ms. Miller was "triggered" by R.W. She clarified that "at one point, the trigger was when [R.W.] became really angry and started cursing at her." Dr. Tellefsen testified that the relationship between R.W. and Ms. Miller was going well until, "she brought up the idea that she needed to be paid for her time before finishing the case, like a retainer, like being paid ahead of time [to R.W.]" and that R.W. "just turned on [Ms. Miller] and became, you know, in her perception, became very aggressive and hostile."[17] In contrast, R.W. provided slightly differing testimony:

> [R.W.]: We had several conversations, rough conversations, and things would be—I was so angry that I just had to hang up on her because, at that

[16] Ms. Tannen is a psychotherapist and licensed clinical professional counselor holding a Bachelor of Arts in psychology from the University of Maryland and a Master of Arts in counseling. Dr. Tellefsen is a forensic psychiatrist holding a Bachelor's degree from the Massachusetts Institute of Technology and a M.D. from the University of Illinois in Chicago.

[17] Both Ms. Tannen's and Dr. Tellefsen's testimony concerning the dispute were based on Ms. Miller's recitation of the events to them.

point, I really got emotional and I didn't want to say anything or do anything that's going to hurt my case . . . with this case going through, so I just hung up on her.

R.W. also testified that a heated phone call occurred in December of 2016:

[R.W.]:    When she said to me that she was not going to—I wouldn't get a court date until I paid in full, I was real angry. I was very angry and it was taking me to a level that I didn't want to go at. Like I didn't—a whole bunch of profanity was getting ready to come out of me because I was very angry because I'm like, all this time, we could have had this done because money was never a factor because we had the money.

Regarding the alleged heated exchange, the hearing judge rejected Ms. Miller's testimony and found that "the February 2016 heated phone call between [Ms. Miller] and R.W. is not substantiated." Primarily, the hearing judge determined that the allegations concerning the occurrence of a heated telephonic dispute ran contrary to subsequent exchanges of text messages between Ms. Miller and R.W. Ms. Miller testified that, after the alleged February 2016 phone call, she did not speak to R.W. until she received a text from R.W. on April 22, 2016. In this message, R.W. stated "[g]ood evening Mrs. Miller, just checking in. Have a great weekend."

The hearing judge determined that this text message was inconsistent with Ms. Miller's versions of events—that a heated telephone conversation occurred in February of 2016, in which R.W. cursed at and insulted Ms. Miller. As detailed above, a hearing judge is authorized to make credibility determinations and to "pick and choose" between conflicting testimony. *Merkle*, 440 Md. at 626–27, 103 A.3d at 690. Obviously, the hearing judge found Ms. Miller's testimony regarding the dispute incredible and R.W.'s testimony credible. Considering that Dr. Tellefsen's and Ms. Tannen's testimony about

- 28 -

the exchange resulted entirely from Ms. Miller's reporting, the hearing judge's finding was not clearly erroneous. Therefore, we overrule this exception to the hearing judge's findings of fact.

*Exception Nine*

Ms. Miller next takes exception to the hearing judge's finding that R.W. had agreed to pay one half of the remaining balance due once Ms. Miller filed the adoption petition, and she would pay the remaining funds on the day of the hearing. Again, Ms. Miller's ninth exception is rightfully stylized as arguing that the hearing judge erred in finding R.W.'s testimony more credible than her own. R.W. testified that, after discovering Ms. Miller had misled her as to where she had filed the petition for adoption, the two came to an agreement concerning payment. According to R.W.'s testimony, under the revised agreement, R.W. agreed to pay Ms. Miller half of the outstanding balance when Ms. Miller provided proof that the petition for adoption had been filed and would pay the remaining balance when the court held a hearing.

In contrast, Ms. Miller testified that R.W. agreed to pay half of the amount immediately and would pay the remaining half on the day of the hearing. The hearing judge commented that he "accepts R.W.'s testimony on this point and rejects [Ms. Miller]'s testimony." Clearly, the hearing judge made an implicit determination concerning the credibility of Ms. Miller's testimony and found it lacking. Given the discretion we afford to the hearing judge's credibility determinations, along with the evidence before him, we are satisfied that the hearing judge did not clearly err in making this factual finding. *See supra* at 15–16. Accordingly, we overrule Ms. Miller's exception.

*Exception Ten*

Next, Ms. Miller excepts to the hearing judge's factual findings that she was not remorseful and that her apologies were feigned. Ms. Miller points to several aspects in support of her position that she was, in fact, remorseful: (i) the October 26 invoice which indicated that Ms. Miller did not intend to charge R.W. for attending the hearing; (ii) Ms. Miller refunding $2,500 to R.W. on August 9, 2018; (iii) an apology letter Ms. Miller mailed to R.W. on January 31, 2019; (iv) apologies Ms. Miller made in her deposition and while testifying before the hearing judge; and (v) Dr. Tellefsen and Ms. Tannen's testimony that they believed Ms. Miller was remorseful.

As repeatedly mentioned above, a hearing judge maintains a great deal of discretion in determining the credibility of witness testimony. In this case, the hearing judge did not find Ms. Miller to be remorseful, because she generally failed to atone for her actions. At the hearing, she continually blamed R.W. for Ms. Miller's failure to take action in the adoption proceedings. She contended that "the only delay was caused by [R.W.'s] refusal to honor her agreement to pay me." Second, when R.W. initially made the complaint against Ms. Miller, R.W.'s subsequent counsel offered Ms. Miller the opportunity to forego an investigation by Bar Counsel by returning the $2,500. Ms. Miller refused and eventually refunded R.W.'s funds a little over three months prior to the circuit court holding a hearing. Third, rather than accept responsibility for her actions in deceiving R.W., Ms. Miller, before this Court, attempts to relitigate many issues within the case. The hearing judge's determination that Ms. Miller's actions were self-serving and do not evidence remorse was

not clearly erroneous. Accordingly, we overrule this exception to the hearing judge's findings of fact.

*Exception Eleven*

Eleventh, Ms. Miller takes exception to the hearing judge's finding that she provided Bar Counsel with a falsified timesheet. According to Ms. Miller, the timesheet is "an artifact created to comply with Bar Counsel's request" and that, in submitting that document, she did not intend to deceive Bar Counsel. Ms. Miller argues that she initially provided Bar Counsel with copies of the invoices she allegedly sent to R.W. In response, Bar Counsel requested her entire client file including timesheets. Ms. Miller testified that she did not have an electronic or codified system for tracking the hours she worked on matters. Instead, she recorded the hours she worked on slips of paper, which she would then transform into client invoices.

Ms. Miller points out that three years transpired between her representation of R.W. and her eventual creation of the timesheet in response to Bar Counsel's request. She avers that, based on this delay, she could not be expected to accurately reconstruct the hours she worked on R.W.'s case. While this may be true, Ms. Miller submitted the timesheet to Bar Counsel without qualification. She did not indicate that the timesheet was constructed to the best of her ability, based on the delay between her representation of R.W. and these disciplinary proceedings. Nor did she indicate that the timesheet may be inaccurate. Instead, she submitted the timesheet to Bar Counsel in a manner that suggested that its contents were true. As explained above, this was not the case. *See supra* at 21–24. For

these reasons, the hearing judge did not clearly err in making this finding, and we therefore overrule this exception.

*Exception Twelve*

Under Ms. Miller's twelfth exception to the hearing judge's findings of fact, she argues that the hearing judge erred in determining that the adoption was relatively routine and did not contain novel or contested issues. She contends that there were numerous issues that she had to address throughout the adoption proceedings: (i) the biological father was unknown; (ii) the adoptive parents were unmarried at the time; (iii) they sought to change N.R.'s name prior to R.W. and M.W.'s marriage, and thus R.W. would assume M.W.'s surname; and (iv) the biological mother was mentally ill and addicted to drugs. This exception largely overlaps with Ms. Miller's sixth exception to the hearing judge's findings of fact, which we have overruled.

As noted above, when the hearing judge inquired as to whether the forms she completed in furtherance of the adoption were "boilerplate," Ms. Miller responded affirmatively. Before this Court, however, she contends that, in answering affirmatively, she meant that some of the forms completed were boilerplate, but the petition for adoption itself was not.

Despite Ms. Miller's representations, a majority of the materials she completed for this case were, in fact, forms. Although she did draft the petition for adoption, her claims that the adoption proceedings were novel or contested are tenuous. Particularly, N.R.'s biological mother consented to the adoption proceedings at issue. The consent of the biological mother to the adoption and the name change were generally completed through

form documents. *See supra* at 25–26. With this in mind, the hearing judge's finding that the adoption proceedings did not involve novel or contested issues was not clearly erroneous. We therefore overrule this exception.

**Ms. Miller's Exceptions to the Hearing Judge "Not finding certain facts"**

In Ms. Miller's exceptions numbered thirteen through twenty, she takes exception to the hearing judge's failure to find certain facts. At the outset, we note that, in the context of attorney grievance proceedings, "the hearing judge is not required to recount all of the evidence presented at the hearing." *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 446, 836 A.2d 605, 618 (2003) (citing *Attorney Grievance Comm'n v. Granger*, 374 Md. 438, 453, 823 A.2d 611, 620 (2003)).

*Exception Thirteen*

Ms. Miller alleges that the hearing judge failed to find that she was the victim of sexual, physical, and emotional abuse by her brothers at a young age. Ms. Miller contends that her testimony on this issue was supported by the testimony of Dr. Tellefsen and Ms. Tannen. Despite Ms. Miller's representation, the hearing judge did find that Ms. Miller experienced abuse during her childhood. Although the hearing judge did not establish this fact within his findings of fact, he clearly referenced this information in his analysis on mitigation. The hearing judge commented,

> [Ms. Miller] stated that her PTSD diagnosis derived from her being physically beaten, emotionally abused, and sexually molested by members of her immediate family when she was younger. While the court is deeply sympathetic towards [Ms. Miller's] traumatic experiences and mental health diagnosis, the court rejects that [Ms. Miller's] PTSD was triggered because the court is not persuaded that the February 2016 conflict occurred between R.W. and [Ms. Miller].

- 33 -

As evident, the hearing judge clearly found that Ms. Miller was the victim of abuse during her childhood. Accordingly, we overrule this exception.

*Exception Fourteen*

Ms. Miller next takes exception to the hearing judge's failure to find that she was suffering from post-traumatic stress disorder ("PTSD"), major depressive disorder—moderate, and a passive personality disorder. As with the previous exception, the hearing judge commented in his analysis with respect to mitigation that Ms. Miller "has been diagnosed with Major Depressive Disorder, [PTSD], and passive dependent personality, which is a personality disorder. [Ms. Miller] has been treated on and off by several therapists and psychiatrists since her early twenties." Therefore, the hearing judge did find that Ms. Miller suffered from these diagnoses. Accordingly, we overrule Ms. Miller's exception on this point.

*Exception Fifteen*

Fifteenth, Ms. Miller takes exception to the hearing judge's failure to find that her diagnoses have "limited her personal and professional options over the course of her life." Ms. Miller avers that the hearing judge ignored Dr. Tellefsen's uncontradicted testimony on this point. Although Dr. Tellefsen did testify that Ms. Miller's diagnoses have impacted her career, this point is largely extraneous. The *Vanderlinde* standard does not contemplate whether mental illness has resulted in obstacles that interfere with or limit an attorney's professional options. The hearing judge likely recognized this testimony but excluded it

from his findings of fact due to its superfluous character.  For this reason, we overrule Ms. Miller's exception.

*Exception Sixteen*

Next, Ms. Miller takes exception to the hearing judge's failure to find that individuals suffering from PTSD, upon experiencing secondary trauma, may have involuntary reactions.  The hearing judge, however, implicitly recognized this fact.  In his findings of fact, the hearing judge noted that Ms. Miller's "expert witnesses testified that a hostile interaction between R.W. and [Ms. Miller], presumably in February 2016, triggered [her] [PTSD]."  In addition, the hearing judge stated that,

> [a]t trial, Dr. Tellefsen testified that the trigger could likely be based on an overreaction by [Ms. Miller] to an imaginary fear regarding R.W.  The Court finds that where [Ms. Miller] testified that there was a verbal altercation with R.W., the question of whether some imagined slight could have caused the misconduct is irrelevant.

As evident, the hearing judge recognized that individuals suffering from PTSD may be "triggered" by certain events.  Despite this, the hearing judge found Ms. Miller's testimony concerning the altercation to be incredible and found that the alleged altercation did not occur.  Accordingly, the hearing judge was not clearly erroneous in this determination and we overrule this exception.

*Exception Seventeen*

Seventeenth, Ms. Miller takes exception to the hearing judge's failure to find that, throughout her career, she has structured her practice in a way that has allowed her to avoid relationships with difficult clients or those that would likely result in disputes.  She contends that testimony by Dr. Tellefsen conclusively establishes this point.

We agree with the hearing judge's finding and perceive no error therein. Particularly, Ms. Tannen's testimony is largely at odds with the record. For example, the majority of Ms. Miller's practice consists of work as a panel attorney for the Office of the Public Defender. Apparently, based on the hearing judge's knowledge concerning the role Public Defenders play, largely in representing indigent criminal defendants, he rejected testimony by Ms. Miller's psychological experts that, within the confines of her law practice, she could avoid interaction with contentious clients. Therefore, we overrule this exception.

*Exceptions Eighteen and Nineteen*

In her eighteenth exception, Ms. Miller challenges the hearing judge's failure to find that she performed an extensive amount of research in completing the petition for adoption. Similarly, in exception nineteen, Ms. Miller takes exception to the hearing judge's failure to find that several unique aspects of R.W.'s case required her to perform a significant amount of legal research. She contends that this additional research was necessary due to several unique aspects of R.W.'s case: (i) the adopted child's biological father's identity was unknown; (ii) the biological mother was a "mentally ill drug addict" which allegedly made establishing informed consent more difficult; (iii) that R.W. and M.W. were unmarried at the time of the adoption; and (iv) whether the child's name could be changed to N.W., prior to R.W. and M.W. marrying, and R.W. assuming the "W." surname.

This exception closely aligns with Ms. Miller's twelfth and fifth exceptions to the hearing judge's findings of fact. The overlap exists because, in those exceptions, Ms. Miller argues that the hearing judge erred in finding that the adoption proceedings did not

involve novel or complex issues. In this exception, she seemingly offers identical justification as to that set forth in exceptions five and twelve. In short, Ms. Miller is attempting to argue that the adoption contained novel issues which necessitated the additional research she allegedly performed. Further, as in exception twelve, Ms. Miller takes exception to the fact that Bar Counsel failed to introduce any expert testimony, from a family law practitioner, concerning the complexity of the issues in the case and the time required to prepare the relevant pleadings and motions in the adoption proceedings.

As discussed at length above, the adoption proceeding undergirding the instant disciplinary action was a relatively routine consent adoption. Although Ms. Miller drafted the petition for adoption and some other documents, the majority of the papers she submitted were, in fact, form motions. Given these circumstances, Ms. Miller may have undertaken additional research, but such research did not render the adoption proceeding novel or contested. Therefore, the hearing judge did not clearly err in making the finding on this point, and we overrule this exception.

*Exception Twenty*

In Ms. Miller's twentieth exception to the hearing judge's factual findings, Ms. Miller argues that R.W. initiated the disciplinary proceedings not to protect the public, but to recover the fees she had paid Ms. Miller. Ms. Miller contends that R.W. and M.W., through the aid of the attorney who represented them after R.W. terminated Ms. Miller's representation, contacted her and informed her that they would be willing to drop the attorney grievance complaint if she returned the $2,500 retainer. Ms. Miller characterizes the arrangement as a "covert agreement" that she refused. Instead, Ms. Miller later

- 37 -

reimbursed the funds to R.W. and M.W. with Bar Counsel's awareness. Overall, this exception is nebulous at best. The hearing judge did not find that R.W. initiated disciplinary proceedings to protect the public. Even if we were to assume that R.W.'s motives were to obtain a refund of fees paid was selfish, we have never held that a client's motivation in bringing disciplinary action against an attorney has any overarching relevance or impact on such proceedings. A client's motives may be a factor to be considered by the hearing judge—particularly within the hearing judge's credibility determinations—however, that is not a factor in this case. *See Tanko*, 427 Md. at 55, 45 A.3d at 305 (concluding that a hearing judge's finding with respect to motive was primarily based upon the hearing judge's credibility determinations); Md. Rule 19-741 (indicating that we generally defer to a hearing judge's assessment of witness credibility). Accordingly, the hearing judge did not clearly err in making this finding. We therefore overrule Ms. Miller's exception.

*Ms. Miller's Exceptions to the Hearing Judge's Conclusions of Law*

Ms. Miller takes exception to three of the hearing judge's conclusions of law, *i.e.* violations of MARPC 1.3, 1.5, and 8.1. All her exceptions emanate from the presumption that this Court will sustain her exceptions to the hearing judge's factual findings. Essentially, she argues that there is an insufficient evidentiary basis from which the hearing judge could conclude that she violated MARPC 1.3, 1.5, and 8.1.

### *MARPC 19-301.3 Diligence*

Ms. Miller's first exception to the hearing judge's conclusions of law closely aligns with her second and sixth exceptions to his factual findings. She posits that the hearing

judge erred in finding that she violated MARPC 1.3, based on the judge's allegedly erroneous factual finding that R.W. was not aware Ms. Miller had delayed filing the adoption petition because of the outstanding balance and that Ms. Miller only provided R.W. with two invoices, rather than monthly invoices as Ms. Miller alleged. She contends that "if this [C]ourt cannot find by clear and convincing evidence that R.W. was only provided with two invoices during the course of the representation, then this [C]ourt cannot sustain the finding of a violation of [MARPC] 1.3." Generally, MARPC 1.3 requires that "[a]n attorney shall act with reasonable diligence and promptness in representing a client."

As indicated above, we overruled Ms. Miller's second exception to the hearing judge's findings of fact. There, she alleged that R.W. received monthly invoices and the hearing judge was incorrect in his determination that she only received two invoices. We concluded that the hearing judge did not clearly err in finding that R.W. only received two invoices from Ms. Miller. *See supra* at 16–17. We have previously held that, under MARPC 1.3, "an attorney violates [MARPC] 1.3 when he or she does 'nothing whatsoever to advance the client's cause or endeavor.'" *Attorney Grievance Comm'n v. Moore*, 451 Md. 55, 80, 152 A.3d 639, 653 (2017) (quoting *Attorney Grievance Comm'n v. Blair*, 440 Md. 387, 402, 102 A.3d 786, 794 (2014)). In this case, Ms. Miller never filed the adoption petition on R.W.'s behalf and therefore, failed to take sufficient action advancing her interests despite R.W.'s repeated requests. Because clear and convincing evidence supports this finding, we overrule Ms. Miller's exception to the hearing judge's conclusion that she violated MARPC 1.3.

### *MARPC 19-301.5 Fees*

Ms. Miller next takes exception to the hearing judge's determination that she violated MARPC 1.5. As with all her exceptions to the hearing judge's conclusions of law, this exception is primarily rooted in Ms. Miller's exceptions to the hearing judge's factual findings. She contends that this Court ought to accept her position, in which she argues that the hearing judge incorrectly found that the adoption proceedings did not involve novel or contested issues. Primarily, her position rests on the fact that Bar Counsel failed to introduce expert testimony from a family law practitioner regarding the amount of work Ms. Miller performed, its complexity, and the cost of her services. Accordingly, she overwhelmingly suggests that such testimony is *sine qua non*.

MARPC 1.5(a) maintains that "[a]n attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The Rule contains a non-exhaustive list of factors that may be considered in determining whether a fee is unreasonable:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the attorney or attorneys performing the services; and
> (8) whether the fee is fixed or contingent.

MARPC 1.5(a)(1)–(8). Ms. Miller's arguments specifically target MARPC 1.5(a)(1), in that she argues that the representation was novel or difficult which justifies the fee that she

initially collected from R.W.  Whereas, she neglects to consider that this is merely one individual factor in determining the reasonableness of a fee.  In her arguments, she overlooks the existence of MARPC 1.5(a)(4), which contemplates "results obtained."

We have previously indicated that "[t]he reasonableness of a fee is not measured solely by examining its value at the outset of the representation; an otherwise reasonable fee can become unreasonable if the lawyer fails to earn it." *Attorney Grievance Comm'n v. Thompson*, 462 Md. 112, 125, 198 A.3d 234, 242 (2018) (citing *Attorney Grievance Comm'n v. Garrett*, 427 Md. 209, 224, 46 A.3d 1169, 1178 (2012)), *reinstatement granted sub nom. Matter of Thompson*, 463 Md. 614, 207 A.3d 218 (2019).  Indeed, "[i]t is irrelevant that the fee is 'initially reasonable' if the attorney fails to perform any of the services for which the attorney was paid." *Attorney Grievance Comm'n v. Gray*, 444 Md. 227, 254, 118 A.3d 995, 1010 (2015) (quoting *Attorney Grievance Comm'n v. Gage–Cohen*, 440 Md. 191, 198–99, 101 A.3d 1043, 1047 (2014)).

Ms. Miller performed some work on the adoption during her representation of R.W.  This work, however, failed to culminate in obtaining any meaningful results on behalf of R.W.  As indicated above, we conclude that the hearing judge's factual findings concerning the number of invoices Ms. Miller sent to R.W. and the point at which R.W. became aware of an outstanding balance is sufficiently supported by the record.  By Ms. Miller's own account, she did not file the pleading and motions she prepared because of the dispute between her and R.W. over fees.  Although Ms. Miller attributes this to the alleged fee dispute that occurred between her and R.W., she nonetheless failed to act pursuant to her client's wishes and failed to obtain any results throughout her representation of R.W.

- 41 -

Moreover, Ms. Miller never filed any documents on behalf of R.W., contrary to R.W.'s requests, despite collecting the $2,500 retainer. Her fee is unreasonable in consideration of the fact that she ultimately failed to file any documents or obtain any meaningful result on behalf of R.W.

We also reject Ms. Miller's arguments that the hearing judge's determination concerning the nature and complexity of the work performed and the reasonableness of the fee must be substantiated by expert testimony. As noted *supra*, this Court has upheld a hearing judge's determination on the complexity of a prenuptial agreement without requiring expert testimony. *Camus*, 425 Md. at 432, 42 A.3d at 9. Accordingly, we overrule Ms. Miller's exception to the hearing judge's finding that she violated MARPC 1.5. Clear and convincing evidence supports his conclusion that Ms. Miller violated MARPC 1.5.

## *MARPC 19-308.1 Bar Admission and Disciplinary Matters*

Next, Ms. Miller takes exception to the hearing judge's conclusion that she violated MARPC 8.1. In pertinent part, MARPC 8.1 provides the following:

> An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> (a) Knowingly make a false statement of material fact;
> (b) Fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 19-301.6 (1.6).

The hearing judge found that Ms. Miller violated both MARPC 8.1(a) and (b). He concluded that she violated MARPC 8.1(a) when she misrepresented to Bar Counsel that she provided R.W. with monthly invoices, provided a modified retainer agreement to Bar Counsel, and submitted a falsified timesheet to Bar Counsel. Ms. Miller, like her other exceptions to the hearing judge's conclusions of law, conditions this exception solely on this Court sustaining her earlier exceptions to the hearing judge's findings of fact that undergird his finding that she violated MARPC 8.1.

As detailed above, in response to Ms. Miller's related exceptions to the hearing judge's factual findings, we are not persuaded by Ms. Miller's position. Through her deposition testimony, testimony at the disciplinary hearing, the monthly invoices, and the timesheet, she provides dual conflicting narratives concerning the amount of work performed on R.W.'s case and the time periods in which this work was performed. Based on our independent review of the record, Ms. Miller misrepresented the amount of work she performed to Bar Counsel in one of these conflicting narratives. Furthermore, as we have overruled Ms. Miller's related factual exceptions, upon which her exception to the hearing judge's MARPC 8.1 finding is based, we also overrule this exception. The hearing judge's determination that Ms. Miller violated MARPC 8.1 is supported by clear and convincing evidence.

### MARPC 19-301.4 Communication

MARPC 1.4 concerns communication between attorneys and their clients and mandates the following:

(a) An attorney shall:

- 43 -

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0 (f) (1.0), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Ms. Miller does not take exception to the hearing judge's finding that she violated MARPC 1.4(a) and (b). In fact, in her response to Bar Counsel dated April 17, 2018, she conceded that she violated MARPC 1.4. She explained, "[i]n hindsight, I realize that I should have consulted with an experienced attorney who had expertise in legal ethics and had experience in managing non-paying clients. Instead of exercising these professionally responsible options, I made a very poor decision and in doing so violated [MARPC] 1.4." Similarly, Ms. Miller's counsel conceded that she violated MARPC 1.4 before the hearing judge.

As this Court has previously commented, "the failure to keep a client reasonably informed about the progress of his representation is a violation of [MARPC 1.4]." *Attorney Grievance Comm'n v. Van Nelson*, 425 Md. 344, 359, 40 A.3d 1039, 1047 (2012) (quoting *Attorney Grievance Comm'n v. Lawson*, 401 Md. 536, 578, 933 A.2d 842, 867 (2007)). Ms. Miller failed to keep R.W. informed of the status of her case, when she consistently misrepresented to her that she had filed the adoption petition and was awaiting a hearing

date. Therefore, the hearing judge's conclusion that Ms. Miller violated MARPC 1.4 is supported by clear and convincing evidence. *See Attorney Grievance Comm'n v. White*, 448 Md. 33, 56 n.13, 136 A.3d 819, 832 n.13 (2016) (upholding a hearing judge's finding that an attorney violated several provisions of the MARPC, including MARPC 1.4, "without extensive discussion" where the attorney conceded that she violated the provision.).

### *MARPC 19-308.4 Misconduct*

MARPC 8.4, in pertinent part, provides the following:

It is professional misconduct for an attorney to:

(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

As mentioned above, the hearing judge concluded that Ms. Miller violated MARPC 8.4(a), (c), and (d) throughout her representation of R.W. Like the MARPC 1.4 violation, Ms. Miller's counsel conceded that she violated MARPC 8.4(a) at the hearing before Judge Dorsey. This concession was made in conjunction with her concession concerning the MARPC 1.4 violation.

Ms. Miller's counsel explained, "I will have to—at the beginning of this case, because I am conceding to a [MARPC] 1.4 violation, I will have to, on my client's behalf, concede to an [MARC] 8.4(a) violation[.]" We agree with the hearing judge's conclusion

that Ms. Miller violated MARPC 8.4(a). *Van Nelson*, 425 Md. at 363, 40 A.3d at 1050 (commenting that "[MARPC] 8.4(a) is violated when other Rules of Professional Conduct are breached."). As we have determined that Ms. Miller violated multiple provisions of the MARPC, we conclude that clear and convincing evidence supports the hearing judge's determination that she violated MARPC 8.4(a).

Ms. Miller also violated MARPC 8.4(c) by misrepresenting the status of the adoption proceedings to R.W. During this period, Ms. Miller consistently misrepresented that she had filed the petition for adoption when, in fact, she had not. This violation is evident through numerous communications via text messages between Ms. Miller and R.W. during the period of April 2016 to October 2016, in which R.W. continually inquired about a hearing date and Ms. Miller repeatedly indicated that she was waiting to obtain a hearing date from the court. As Ms. Miller has acknowledged, none of this was true. She did not file the petition for adoption on behalf of R.W. and, therefore, did not visit the clerk's office to inquire about the status of the case as she had represented to R.W. on several occasions. Overall, Ms. Miller made several misrepresentations to R.W.

We have previously explained that "[t]he failure to communicate a material fact with a client, when done in a misleading way, is a violation of [MARPC] 8.4(c)." *Attorney Grievance Comm'n v. London*, 427 Md. 328, 350–51, 47 A.3d 986, 999 (2012) (citing *Attorney Grievance Comm'n v. Brown*, 426 Md. 298, 324, 44 A.3d 344, 360 (2012)). Additionally, "lying to a client about whether a pleading was filed can amount to a violation of [MARPC] 8.4(c)." *Attorney Grievance Comm'n v. Webster*, 402 Md. 448, 461, 937 A.2d 161, 169 (2007). Not unlike the case at bar, in *London*, we held that an attorney

- 46 -

violated MARPC 8.4(c) by misrepresenting to his client that he had recorded a deed to real property on behalf of the client. 427 Md. at 350, 47 A.3d at 999–1000; *see also Attorney Grievance Comm'n v. Harrington*, 367 Md. 36, 48–51, 785 A.2d 1260, 1267–69 (2001) (holding that an attorney violated MARPC 8.4(c) by misrepresenting to his client that he had filed a medical malpractice suit on her behalf); *Attorney Grievance Comm'n v. Steinberg*, 395 Md. 337, 369, 910 A.2d 429, 448 (2006) (holding that an attorney violated MARPC 8.4(c) by misrepresenting to his client that he had filed a bankruptcy petition on her behalf). Therefore, Ms. Miller's misrepresentation to R.W. that she had filed the petition for adoption violated MARPC 8.4(c).

Additionally, we have previously applied the "general proposition that a violation of Rule 8.1(a) also violates Rule 8.4(c), as a knowingly false statement to Bar Counsel qualifies as at least conduct involving misrepresentation." *Attorney Grievance Comm'n v. Singh*, 464 Md. 645, 677, 212 A.3d 888, 907 (2019). Because we concluded that Ms. Miller violated MARPC 8.1(a), this substantiates her violation of MARPC 8.4(c). Accordingly, clear and convincing evidence supports the hearing judge's determination that Ms. Miller violated MARPC 8.4(c) throughout her representation of R.W.

We also agree with the hearing judge's conclusion that Ms. Miller violated MARPC 8.4(d). This Court has previously commented that, "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice. In general, an attorney violates [MARPC] 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Ogilvie*, 457 Md. 686, 692, 181 A.3d 218, 221–22 (2018) (quoting *Attorney*

- 47 -

*Grievance Comm'n v. Reno*, 436 Md. 504, 509, 83 A.3d 781, 784 (2014)). Ms. Miller's conduct, taken as a whole, including misrepresenting the status of R.W.'s case, casts a detrimental light onto the profession and therefore constitutes a violation of MARPC 8.4(d). Accordingly, the hearing judge's determination that Ms. Miller violated MARPC 8.4(d) is supported by clear and convincing evidence.

## SANCTION

We have previously commented that "[d]etermining the appropriate sanction requires this Court to consider the facts and circumstances of each particular case, including consideration of any mitigating factors." *Christopher*, 383 Md. at 639, 861 A.2d at 701. The imposition of sanctions against an attorney is not aimed towards punishing the attorney. *Moore*, 451 Md. at 88, 152 A.3d at 658. Instead, sanctions are intended to "protect the public and the public's confidence in the legal profession." *Woolery*, 462 Md. at 250, 198 A.3d at 859 (quoting *Moore*, 451 Md. at 88, 152 A.3d at 658). We have commented that "[t]he question of the severity of an appropriate sanction 'depends on the circumstances of each case, the intent with which the acts were committed, the gravity, nature, and effect of the violations, and any mitigating factors.'" *Moore*, 451 Md. at 88, 152 A.3d at 658 (quoting *Attorney Grievance Comm'n v. Ward*, 394 Md. 1, 33, 904 A.2d 477, 496 (2006)). We begin by considering applicable mitigating factors.

In attorney grievance proceedings, this Court considers several factors of mitigation based on American Bar Association ("ABA") Standard 9.32. *Attorney Grievance Comm'n v. Paul*, 423 Md. 268, 281 n.13, 31 A.3d 512, 520 n.13 (2011). We have previously recognized the following mitigation standards, such as,

- 48 -

absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Attorney Grievance Comm'n v. Mahone*, 398 Md. 257, 269, 920 A.2d 458, 465 (2007) (quoting *Attorney Grievance Comm'n v. Lee*, 393 Md. 546, 564, 903 A.2d 895, 906 (2006)). Before the hearing judge, Ms. Miller argued that the following mitigating factors applied: (i) absence of prior discipline; (ii) personal or emotional problems; (iii) physical or mental disability; (iv) timely good faith efforts to make restitution or rectify consequences of misconduct; (v) full and free disclosure to disciplinary board; (vi) character or reputation; (vii) imposition of other penalties or sanctions; (viii) remorse; and (ix) the unlikelihood of the repetition of misconduct. Despite her contentions, the hearing judge found that the only applicable factor in mitigation was Ms. Miller's lack of a prior disciplinary record.

Before this Court, Ms. Miller argues that the hearing judge erred in finding only one applicable mitigating factor. Instead, she contends that several apply including, (i) personal or emotional problems; (ii) timely good-faith efforts to make restitution; (iii) character or reputation; (iv) mental disability or impairment; (v) remorse; and (vi) the unlikelihood of repetition of the misconduct.

We agree with the hearing judge's determination that Ms. Miller's lack of a prior disciplinary record constitutes a mitigating factor. Bar Counsel concedes that the hearing

judge should have found Ms. Miller's character and reputation a mitigating factor. Throughout the hearing, several of her peers and former colleagues testified as to Ms. Miller's good reputation throughout the legal community. With no testimony to the contrary, the hearing judge should have found the existence of this mitigating factor. We therefore sustain Ms. Miller's and Bar Counsel's exceptions on this point. Nonetheless, the same cannot be said for Ms. Miller's remaining contentions regarding mitigation.

First, Ms. Miller argues that the hearing judge erroneously failed to find that she undertook timely good faith efforts to make restitution or to rectify the consequences of her misconduct. Essentially, Ms. Miller contends this factor should have been found, because she apologized to R.W. on several occasions and eventually refunded R.W.'s funds. Despite Ms. Miller's apologies to R.W., we agree with the hearing judge's determination that these efforts were neither made in a timely fashion nor undertaken in good faith to rectify the consequences of her misconduct. Primarily, Ms. Miller did not provide the refund to R.W. until January 31, 2019. This refund came long after Ms. Miller's dispute with R.W. and after R.W. had filed her complaint with Bar Counsel.

Moreover, the hearing judge found that restitution was not made in good faith. Primarily, he determined that Ms. Miller's efforts were "self-serving[.]" Considering that Ms. Miller, before the hearing judge, argued that returning R.W.'s funds constituted the imposition of other penalties or sanctions—we agree. If the refunds were made in good faith to rectify the consequences of her misconduct, Ms. Miller would not have stylized the repayment as a sanction or penalty. Therefore, the hearing judge's conclusion that the

refund emerged from self-serving and not altruistic motives is correct. Accordingly, our independent review of the record reveals that this mitigating factor is absent.

Second, Ms. Miller argues that, throughout these disciplinary proceedings, she demonstrated remorse and such remorse constitutes a mitigating factor. As noted by the hearing judge, Ms. Miller has consistently blamed R.W. for her failure to file the adoption petition. Before the hearing judge, she argued that "the only delay was caused by [R.W.'s] refusal to honor her agreement to pay me." Moreover, before this Court, she continually attempts to relitigate the facts of her case, largely reiterating arguments that the hearing judge rejected, and still attributes a portion of the blame for her actions on R.W.'s failure to pay additional funds. With this in mind, remorse is not a mitigating factor for Ms. Miller and the hearing judge was correct in his finding.

Third, Ms. Miller argues that the hearing judge erred in failing to find that she would be unlikely to repeat the misconduct complained of in these grievance proceedings. The hearing judge found Ms. Miller's arguments on this point to be "too speculative." At the hearing, when asked whether Ms. Miller would be likely to repeat the misconduct, Dr. Tellefsen explained that, in her view, it is "more likely than not" that Ms. Miller would not engage in similar misconduct in the future. In addition, Ms. Tannen testified that, in her view, "with education and improvement of the self," she did not believe Ms. Miller would repeat the misconduct. Despite Ms. Tannen's and Dr. Tellefsen's recommendations, we cannot say that the hearing judge was clearly erroneous in his conclusion that the nature of Ms. Miller's arguments were too speculative considering the potentiality of future misconduct. This is especially true in consideration of the intentionally dishonest conduct

Ms. Miller engaged in with respect to both her client and the misrepresentations she made to Bar Counsel.

Next, we group together Ms. Miller's arguments in favor of mitigation concerning personal or emotional problems and mental disability or impairment, because Ms. Miller's arguments towards these two factors overlap substantially. In short, Ms. Miller contends that her PTSD was the underlying cause of her misconduct and the hearing judge erred by not finding her PTSD a factor in mitigation. Within this exception, she argues that the hearing judge erred in determining that an angry confrontation between her and R.W. did not occur, which we have already addressed. She also urges this Court to expand the standard previously announced in *Vanderlinde*, to encompass mental health disorders that cause only temporary debilitation. 364 Md. 376, 773 A.2d 463.

> In *Vanderlinde*, we commented,
>
> in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising **from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [MARPC]. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.**

*Id.* at 413–14, 773 A.2d at 485 (emphasis added). Therein, we explained the "root cause" standard by stating,

> when we are considering offenses relating to honesty, especially where there is any type of theft or intentional misappropriation of funds or other serious

criminal conduct, there, since *Kenney*, needs to be almost conclusive, and essentially uncontroverted evidence that would support a hearing judge's finding **not only that the attorney had a serious and debilitating mental condition, but that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion. Unless that standard is met the impairment is not 'the root cause' of the misconduct.**

*Id.* at 418–19, 773 A.2d at 488 (emphasis added).  Therefore, disbarment is generally the appropriate sanction for intentionally dishonest conduct, unless an attorney can establish the existence of "compelling extenuating circumstances justifying a lesser sanction." *Id.* at 413, 773 A.2d at 485 (quoting *Attorney Grievance Comm'n v. Tomaino*, 362 Md. 483, 498, 765 A.2d 653, 661 (2001)).  As evident, we have cabined the *Vanderlinde* standard to cases "involving dishonesty, stealing, intentional misappropriation, fraud, serious criminal offenses, and the like[.]" *Id.* at 414, 773 A.2d at 485–86.

This is not the first case in which this Court has considered PTSD in terms of mitigation for a mental health disability.  Previously, we agreed with a hearing judge's determination that an attorney's depression, anxiety, and PTSD constituted mitigating factors. *See Attorney Grievance Comm'n v. Bocchino*, 435 Md. 505, 539, 80 A.3d 222, 241 (2013).[18]  According to his experts, Mr. Bocchino was "unable to engage productively in his work as an attorney for the State of Maryland.  His diminished concentration, [an

---

[18] As opposed to the instant grievance proceedings, in *Bocchino*, this Court found that the *Vanderlinde* standard was not implicated, because "[d]ishonesty [was] not the flagship violation in [Mr. Bocchino]'s case[.]"  435 Md. at 538, 80 A.3d at 241.   Nonetheless, *Bocchino* stands for the proposition that this Court has and will recognize PTSD as a mitigating factor under appropriate circumstances.

extreme lack of energy], markedly diminished motivation and poor self-esteem, all would contribute to a recurrence of his poor work performance." *Id.* at 527, 80 A.3d at 235 (alteration in original). The hearing judge determined that Mr. Bocchino's "conditions . . . contributed to his inability to perform his duties as an attorney in the past and resulted in his medical retirement from his position as an assistant attorney general[.]" *Id.* at 528, 80 A.3d at 235. The same, however, cannot be said in the instant disciplinary proceedings. In this case, the *Vanderlinde* standard is implicated by Ms. Miller's intentionally dishonest conduct—through both her misrepresentations to her client and to Bar Counsel. Further, her PTSD is not a factor in mitigation, because it fails to meet the "root cause" standard promogulated in *Vanderlinde* and its progeny. *See Christopher*, 383 Md. at 640, 861 A.2d at 701–02 (quoting *Vanderlinde*, 364 Md. at 408–09, 773 A.2d at 482).

Before the hearing judge, two expert witnesses testified as to Ms. Miller's mental infirmities: Ms. Tannen and Dr. Tellefsen. Their testimony revealed that Ms. Miller's affliction does not rise to the "root cause" standard as required under *Vanderlinde*. Ms. Tannen testified that, in her professional opinion, Ms. Miller's conditions did not render her unable to conform her conduct with the MARPC. When questioned concerning the impact Ms. Miller's diagnoses had on her practice, Ms. Tannen testified as follows:

> Q: Okay. Would you agree that Ms. Miller's conditions are not utterly debilitating?
> A: I absolutely agree that they're not utterly debilitating, but you'd have to define what is being debilitated.
> Q: Okay. And is Ms. Miller able to conform her conduct to the law?
> A: I believe she is.
> Q: And would you agree that Ms. Miller is able to conform her conduct to the Rules of Professional Conduct?
> A: I believe as a rule she is.

Dr. Tellefsen provided the following testimony on the issue of Ms. Millers' PTSD:

Q: Dr. Tellefsen, do you have an opinion within a reasonable degree of medical certainty as to whether or not Ms. Miller's diagnoses that you've described had impaired her ability to practice law in general throughout her career?

A: Yes. I think that it's been very limited for her. I think that it has, first of all, limited her stamina, her endurance. So[,] she's never been able to sort of maintain what other people would think of as a full schedule. So[,] she's always been limited in that regard. I think she's been limited by the types of cases that she takes on. She's very, very bright. And could have done a lot with her career, but because she is easily intimidated, she's really backed off and kind of worked in more of the—I'm not quite sure what the right word is. Maybe the fringes of practice. That she does a lot of temp work. She's never really stayed with one law firm for a long time. That sort of thing.

\* \* \*

Q: Do you have an opinion within a reasonable degree of medical certainty whether or not because of Ms. Miller's [PTSD] she was able to conform her conduct with R.W. at the time when this conflict came up about the money to the Rules of Professional Responsibility and Conduct that she must maintain as an attorney?

A: I think that in the way that I understand what happened between her and the client, that it—her behavior with this client is fully consistent with her mental disorders. I think that as time went on, you know, the rational part of her was more and more in control of her situation. I'm not quite sure what would have happened if the client hadn't really put it to her so directly, was it like October or September, after several months of her putting off the client. The client comes back and says, oh, you haven't filed the—I found out you haven't filed the papers. I don't know what would have happened if the client hadn't done that, how she would have resolved it. But I think that she probably was heading in the direction of telling the client that she hadn't done anything.

But at the time when she first started doing this, I think that was fully consistent with her mental disorder.

\* \* \*

- 55 -

Q: Do you have an opinion within a reasonable degree of medical certainty as to whether Ms. Miller will be able to, in the future, always conf[o]rm her conduct to the Rules of Professional Responsibility?

A: This is the only time she's ever had a significant problem in her career. So[,] she's been practicing for, I don't know, 10, 15 years. And was fully in keeping with the requirements. And I think that this situation has really opened her eyes to how her early life situation has really affected her life. She has now—I mean, the fact that I'm sitting here talking about it is kind of a huge breakthrough for her, that for years she didn't want to have this abuse reported to anybody.

I mean, reporting it is earthshaking for her family. And to some extent having it now out in the open, making the covert overt, has helped her accept what's happened to her, to understand how it's affected her, and to be able to tailor her life as she goes forward.

\* \* \*

Q: Do you have an opinion within a reasonable degree of medical certainty of whether or not Ms. Miller's [PTSD] was the root cause of her misrepresentations to this particular client?

A: Yes.

Q: And what is that opinion?

A: Absolutely.

In summary, although Dr. Tellefsen identified Ms. Miller's PTSD as the "root cause" of her misconduct and that her misconduct was consistent with her diagnosis, she did not testify that Ms. Miller, because of her PTSD, was unable to conform her conduct with the requirements of the MARPC or Maryland law generally. Similarly, Ms. Tannen testified that Ms. Miller's PTSD was not utterly debilitating, and that Ms. Miller, despite her diagnosis, is able to conform her conduct with the requirements of the MARPC and the laws of Maryland.

As evident, Ms. Miller's mental disability falls short of the *Vanderlinde* standard. Although Dr. Tellefsen testified that her mental disability was the "root cause" of her

misconduct, there is insufficient evidence that it affected Ms. Miller's "ability . . . in normal day to day activities, such that [she] was unable to accomplish the least of those activities in a normal fashion." *Attorney Grievance Comm'n v. Palmer*, 417 Md. 185, 212, 9 A.3d 37, 53 (2010) (quoting *Vanderlinde*, 354 Md. at 419, 773 A.2d at 488). The testimony adduced throughout these proceedings also does not conclusively establish that, based on her PTSD, Ms. Miller was unable to conform her conduct to the laws of Maryland and the MARPC. *See Vanderlinde*, 364 Md. at 413–14, 773 A.2d at 485.

Ms. Miller implicitly recognizes that straightforward application of *Vanderlinde* would be inappropriate. At oral argument, she conceded that her disability would not meet the standard announced in *Vanderlinde*. Accordingly, she argues that this Court should take a more expansive approach in our application of *Vanderlinde*. In essence, she contends that attorneys suffering from PTSD can be "re-traumatized" by certain events which can, in turn, lead the attorney to engaging in misconduct. Ultimately, we decline to expand the *Vanderlinde* standard.

We have previously remarked that the purpose of sanctions in attorney discipline cases is to "protect the public[,]" "to protect the integrity of the legal profession, and to deter other lawyers from engaging in violations of the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Cassidy*, 362 Md. 689, 698, 766 A.2d 632, 637 (2001) (citing *Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 254, 760 A.2d 1108, 1119 (2000)). Expanding the *Vanderlinde* standard, as requested by Ms. Miller, would limit our ability to effectuate these overarching goals of sanctioning attorneys on account of their misconduct. Moreover, we have consistently applied *Vanderlinde* without question as to

- 57 -

the breadth of its application.  *See Christopher*, 383 Md. at 641–42, 861 A.2d at 701–03; *Attorney Grievance Comm'n v. Zakroff*, 387 Md. 603, 645–46, 876 A.2d 664, 689–90 (2005); *Guida*, 391 Md. at 56–57, 891 A.2d at 1098–99; *Attorney Grievance Comm'n v. Patton*, 432 Md. 359, 382–84, 69 A.3d 11, 24–25 (2013); *Attorney Grievance Comm'n v. Gray*, 444 Md. 227, 262, 118 A.3d 995, 1014–15 (2015).[19]

There are further practical difficulties with the facts of Ms. Miller's case and their interaction with the *Vanderlinde* standard, even if we endorsed her expansive view of the standard.  In particular, Ms. Miller theorizes that her misconduct was engendered, at least in part, by a contentious phone conversation between her and R.W. in February of 2016. Assuming *arguendo* that this confrontation occurred, it occurred over two months after Ms. Miller had acquired the signature of N.R.'s biological mother consenting to the adoption. At this point, Ms. Miller could have filed the petition for adoption, but declined to do so, before any alleged heated conversation.  Based on the temporal arrangement of these events, Ms. Miller's misconduct in misrepresenting to R.W. that she had filed the petition for adoption could not have been caused by re-traumatization stemming from a heated dispute with R.W.  Therefore, we decline to expand the *Vanderlinde* standard and next consider aggravating factors.

Aggravating factors are essentially the antithesis of mitigating factors and "militate in favor of a more severe sanction[.]" *Attorney Grievance Comm'n v. Sanderson*, 465 Md. 1, 67, 213 A.3d 122, 161 (2019) (quoting *Attorney Grievance Comm'n v. Kremer*, 432 Md.

---

[19] This list of cases is not exhaustive.  The *Vanderlinde* standard has been applied in countless attorney grievance cases since its inception in 2001.

325, 337, 68 A.3d 862, 869 (2013)).  The aggravating factors applicable in our analysis on attorney sanctions emanate from Standard 9.22 of the ABA Standards for Imposing Lawyer Sanctions and include the following:

(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution.

*Patton*, 432 Md. at 379–80, 69 A.3d at 23 (quoting *Attorney Grievance Comm'n v. Bleecker*, 414 Md. 147, 176–77, 994 A.2d 928, 945–46 (2010)).  Before the hearing judge, Bar Counsel alleged the existence of five aggravating factors: (i) dishonest or selfish motive; (ii) a pattern of misconduct; (iii) multiple offenses; (iv) submission of false statements during the disciplinary process; and (v) substantial experience in the practice of law.  The hearing judge found the existence of all the alleged aggravating factors, except the second—a pattern of misconduct.  Before this Court, neither party makes arguments concerning the hearing judge's findings on aggravating factors.

Based upon our independent review of the record, we agree with the hearing judge's findings concerning the existence of aggravating factors.  First, Ms. Miller acted dishonestly both in her representation of R.W. and her interactions with Bar Counsel

- 59 -

throughout its investigation. Second, as evidenced by our analysis, Ms. Miller engaged in multiple violations of the MARPC.

Third, Ms. Miller undoubtedly submitted false statements to Bar Counsel throughout its investigation. Her submission of false statements becomes clear in consideration of the discrepancies between her answers during her deposition, her testimony at the disciplinary hearing, the timesheet she constructed specifically for Bar Counsel's investigation, and the monthly invoices she allegedly sent to Ms. Miller and provided to Bar Counsel. *See supra* at 21–24. As detailed above, the only logical conclusion stemming from these discrepancies is that Ms. Miller submitted false statements to Bar Counsel throughout its investigation. Fourth, Ms. Miller has been a member of the bar of Maryland since 1998 and undoubtedly has substantial experience in the practice of law.

Fifth, the hearing judge found that although Ms. Miller committed multiple violations of the MARPC, her misconduct stemmed singularly from her representation of R.W. Ms. Miller's violations of the MARPC can all be traced back to her failure to file the petition for adoption on behalf of R.W. Although she later made misrepresentations to Bar Counsel, Bar Counsel's investigation and the transgressions committed by Ms. Miller, therein, were necessitated by her professional failures relating to her representation of R.W. Overall, we agree with the hearing judge's finding. As evident, in the instant disciplinary

proceedings, the aggravating factors outweigh the mitigating factors.[20]  Next, we review

our relevant precedent to assist us in surmising the appropriate sanction.

The instant disciplinary proceedings are comparable to those in *Guida*, 391 Md. 33,

891 A.2d 1085.  Not unlike Ms. Miller, Mr. Guida was retained to effectuate adoption

proceedings.  *Id.* at 40, 891 A.2d at 1089.  In that case, Mr. Guida consistently

misrepresented to his clients that he had filed a petition for adoption.  *Id.* at 40–41, 891

A.2d at 1089–90.  In addition, he forged a document titled "Judgment of Adoption

*Pendente Lite*[,]" provided it to his clients, and represented that the document originated

from a judge of the Circuit Court for Cecil County.  *Id.* at 41, 891 A.2d at 1089.  Mr. Guida

also accepted a $735 retainer from his clients, deposited it directly into his operating

account, and neglected to hold the funds in an attorney trust account.  *Id.* at 42, 891 A.2d

at 1090.

Throughout the disciplinary proceedings, Mr. Guida conceded a majority of the

violations alleged, and the primary issue before this Court's was mitigation.  *Id.*  In

particular, Mr. Guida suffered from major depression, which he argued adequately

mitigated his violations under *Vanderlinde*.[21]  *Id.* at 62–63, 891 A.2d at 1101–02.

Ultimately, we determined that Mr. Guida violated Rules 1.1; 1.4; 1.5; 1.15; 8.1; and 8.4.

*Id.* at 53–55, 891 A.2d at 1097–98.  The Court noted that, "Dr. Tellefsen's testimony may

---

[20] In this case, we have established the existence of two mitigating factors and four aggravating factors.

[21] The same expert witness that testified in this case, Dr. Tellefsen, testified concerning Mr. Guida's mental health condition and its impact on his practice and life.  *Guida*, 391 Md. at 45, 891 A.2d at 1092.

have satisfied a 'but for' standard, *i.e*. [Mr.] Guida would not have falsified the adoption order but for his depression." *Id.* at 62, 891 A.2d at 1102. Nonetheless, in *Vanderlinde*, we explained that the standard is more exacting than requiring a simple causative relationship between a mental infirmity and professional misconduct:

> [T]here . . . needs to be almost conclusive, and essentially uncontroverted evidence that would support a . . . finding not only that the attorney had a serious debilitating mental condition, but that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion. Unless that standard is met the impairment is not "the root cause" of the misconduct.

*Id.* (quoting *Vanderlinde*, 364 Md. at 418–19, 773 A.2d at 488) (alterations in original). We then determined that, based on Mr. Guida's misconduct and its intentionally dishonest character, the appropriate sanction was disbarment. *Id.* at 63, 891 A.2d at 1102–03.

Overall, *Guida* is instructive. Like Mr. Guida, Ms. Miller engaged in violations of MARPC 1.3, 1.4, 1.5, 8.1, and 8.4. Although she did not falsify a court order as was the case in *Guida*, she made numerous misrepresentations to Bar Counsel throughout its investigation in an attempt to minimize any potential sanction. As indicated above, Ms. Miller submitted to Bar Counsel a falsified timesheet, invoices, and failed to comply with Bar Counsel's lawful request for information by failing to provide copies of email and text message communications between her and R.W.

In contrast, Ms. Miller contends that she should, at most, be subject to a temporary indefinite suspension with a right to reapply. She primarily relies on *Singh*, in which we held that an attorney violated Rules 1.3, 1.4, 1.7, 1.8, 1.15, 19–404, 8.1, and 8.4. 464 Md. at 666–677, 212 A.3d at 900–07. As a result, the attorney was suspended from the practice

- 62 -

of law for sixty days. *Id.* at 681–82, 212 A.3d at 909–10. Despite Ms. Miller's reliance, *Singh* is inherently distinguishable from the instant grievance proceedings. In that case, Mr. Singh only made one misleading statement to Bar Counsel regarding whether he deposited client funds in an attorney trust account. *Singh*, 464 Md. at 650, 212 A.3d at 891. Moreover, Mr. Singh's client eventually obtained the relief he sought, represented by another attorney, based on Mr. Singh's recommendation and earlier work towards this end. *Id.* at 664, 212 A.3d at 899.

The Dissenting opinion in *Singh*, however, noted that the bright-line rule that disbarment is generally the appropriate sanction in cases involving intentional dishonesty is limited in some respects: "[t]hat said, this Court has imposed lesser sanctions on certain lawyers who lied only to Bar Counsel—as opposed to lying to a client, opposing counsel, and/or a court." *Id.* at 683, 212 A.3d at 911 (Watts, J., Dissenting) (citing *Attorney Grievance Comm'n v. Lee*, 393 Md. 385, 415, 903 A.2d 360, 378 (2006)). Here, Ms. Miller not only made several misrepresentations to Bar Counsel in an attempt to surreptitiously interfere with its investigation, she also misrepresented the status of the adoption proceedings to her client, R.W., for a substantial period of time.

The *Singh* Majority made a distinction between cases in which attorneys made misrepresentations to Bar Counsel based on whether the attorney's conduct resulted in "significant harm to clients." *Singh*, 464 Md. at 680, 212 A.3d at 909. The Majority commented that, "[d]espite the violations enumerated above, [Mr. Singh's client] benefitted from his attorney-client relationship with Mr. Singh in 2016." *Id.* at 681, 212 A.3d at 909. Ms. Miller latches onto this distinction and argues that her conduct did not

- 63 -

result in significant harm to R.W., because she eventually returned R.W.'s funds and R.W.'s subsequent attorney completed the adoption proceedings.

Her arguments, however, overlook an important nuance. From the outset of the representation, R.W. made it clear to Ms. Miller that she desired to have the adoption completed by her wedding date, so the couple could announce the adoption at their wedding ceremony. Indeed, the hearing judge noted that Ms. Miller "understood that it was significant for the adoption to be completed prior to July 30, 2016." Although the harm was not financial in nature, *per se*, R.W. was indeed harmed by Ms. Miller's misconduct. Furthermore, the record does not clearly demonstrate how R.W. benefitted in any way from Ms. Miller's representation of her. Therefore, Ms. Miller's reliance on *Singh* is misguided.

To reiterate, we have consistently held that, under *Vanderlinde*, "in the absence of compelling extenuating mitigation, disbarment is the appropriate sanction in order to protect the public and the public's confidence in the legal system." *Patton*, 432 Md. at 384, 69 A.3d at 26 (citing *Guida*, 391 Md. at 62, 891 A.2d at 1102). In the instant grievance proceedings, Ms. Miller's PTSD does not rise to the level of "compelling extenuating mitigation[,]" because she failed to establish that it met the "root cause" standard under *Vanderlinde*. *Id.* Accordingly, given the multitude of violations of the MARPC, Ms. Miller engaged in and the overarching dishonesty undergirding a substantial number of these violations, disbarment is the only appropriate sanction.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO**

- 64 -

**MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ANNE MARGARET MILLER.**